472 So.2d 11 (1985)
LOUISIANA STATE BAR ASSOCIATION
v.
Nesib NADER.
No. 83-B-2584.
Supreme Court of Louisiana.
June 28, 1985.
Rehearing Denied September 9, 1985.
*12 Thomas O. Collins, Jr., New Orleans, Alfred S. Landry, New Iberia, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Wood Brown, III, New Orleans, Sam J. D'Amico, Baton Rouge, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Philippi P. St. Pee', Metairie, Gerald F. Thomas, for applicant.
Nesib Nader, in pro. per.
Ronald J. Miciotto, Shreveport, for respondent.

DISCIPLINARY PROCEEDINGS
CALOGERO, Justice.
In this attorney discipline matter defendant was charged with multiple violations of the disciplinary regulations of the Code of Professional Responsibility. The Commissioner appointed by this Court found defendant guilty of seventeen violations arising from fifteen different incidents.[1] Of the violations, five arose out of respondent's borrowing money from clients,[2] eight involved taking criminal cases on contingency bases,[3] three were for neglecting legal matters,[4] and one was for soliciting[5].
The Commissioner made an excellent and exhaustive report. He made no recommendation with respect to the appropriate discipline which should be imposed. The Bar Association for the most part concurred in the Commissioner's report. They excepted to his findings in only minor particulars. They recommend disbarment. Respondent concurred in some of the Commissioner's findings, but excepted to a number of the findings. He argues that the appropriate discipline should be a short period of suspension.
Respondent Nader's problems arose in large measure out of his lack of sufficient income. He freely admitted that for a two year period prior to August, 1983 he was in an extremely difficult financial situation. During this time he was pressured by his wife to bring home $2,000.00 to $2,500.00 per week. He was sued several times. His financial condition was such that he could not file some of his clients' lawsuits because he did not have the money to pay advance court costs even though he had received the fees and court costs from the clients. He admitted that during this two year period he could not meet the financial demands being made upon him and he knew "that this is going to eventually catch up with me."

TAKING CRIMINAL CASES ON A CONTINGENCY FEE BASIS
The Commissioner found Nader guilty of eight violations of DR2-106(C)[6] which provides:

*13 A lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for representing a defendant in a criminal case.
In five of the cases Nader agreed to refund a fee in a criminal case if he was not able to obtain a promised result. For example, in one case Nader signed an agreement that he would have a client released from jail by December 27, 1982 or he would refund the money. In three instances, he guaranteed a given result but did not specify the sanction for his failure to do so. Nader wrote a client a letter which stated that "for an additional $300.00, you will not serve time."
A guarantee relative to the outcome of the case coincident with receipt of a fee, carries with it the implied promise to refund the fee if the promised outcome is not achieved. It is thus clearly a contingent fee arrangement. Such practice in criminal matters is expressly prohibited by the foregoing Disciplinary Rule. The Commissioner's findings were correct. The actions of respondent constitute a clear violation of DR2-106(C).
The Commissioner was also correct in finding these actions were violations of DR1-102(A)(4) (engaging in conduct involving misrepresentation), since no lawyer can guarantee the result of any judicial proceeding; and DR1-102(A)(5) (engaging in conduct that is prejudicial to the administration of justice). The attorney, by accepting a criminal case on a contingency fee basis makes it appear to the client that he is using personal influence, or something worse, to manipulate the judicial system in order to obtain the promised result. This may lead the client to conclude that the judicial system is susceptible to manipulation. Fostering such beliefs is prejudicial to the administration of justice.

NEGLECTING A LEGAL MATTER
DR6-101(A)(3) provides as follows: "A lawyer shall not neglect a legal matter entrusted to him." The Bar Association charged respondent with numerous violations of this Disciplinary Rule. The Commissioner *14 found only three specific violations because Nader's erratic behavior caused many of his clients to discharge him early, at a time which made it difficult to determine if he had neglected their cases. The Commissioner was correct in each of the three instances although two of them apparently had only minor adverse impacts on the client.[7] The third instance is more serious.
Robinson, Noyes and George hired Nader to represent them in a criminal case in Claiborne Parish. He gave them a receipt with the words "No time, no sentence" written thereon. When they were arraigned he was not present, but he did arrange for another attorney to stand in for him at the arraignment. Prior to the arraignment he told the three clients to plead guilty "because he knew we wasn't going to get any time." He also told the clients to plead guilty and not to say anything about it to the lawyer whom he had arranged to stand in for him at the arraignment. All three entered pleas of guilty and thereafter paid Nader another fee and received a receipt which stated "To obtain probation and/or fine." At sentencing George received eight years at hard labor, Robinson three years at hard labor, and Noyes three years at hard labor. Noyes' sentence was suspended and she was placed on probation, a condition which required her to spend sixty days in the parish jail. The Commissioner found, and we agree, that there is no evidence to indicate that Nader did anything to improve the legal position of any of the three clients. He had no contact with the judge in the matter until after they had been sentenced, and then only when the judge first called him. Nader's sole contribution was to induce his clients to waive any and all possible rights that they may have been entitled to assert in their defense, solely to obtain his fees. He did nothing for them. Not only did they not receive adequate representation, but they received from Nader no legal representation at all. The Commissioner correctly opined that this conduct goes beyond being prejudicial to the administration of justice and that it is "a large black mark against the entire judicial system" and a violation of DR1-102(A)5 of serious magnitude.
The conduct of respondent in all three instances was indeed neglect of a legal matter and it reflected on his fitness to practice law.

SOLICITATION
DR2-103(A) provides:
(A) A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer.
In August or September of 1981 Calvin Willis was in court charged with aggravated rape. He was represented by an attorney with the Indigent Defender's Office. Willis' grandmother testified that on that date she was approached in the hall of the Caddo Parish Courthouse by Mr. Nader who asked her "what was the trouble." She told Nader of her grandson's problem, whereupon Nader advised her that he could do a better job than the Indigent Defender because the latter was just out of law school. The grandmother told Nader that before she could employ him she would have to talk to her husband. Later Nader called her into the hall and told her that he had talked to her husband and received his approval. When she called her husband on the telephone he confirmed that Nader had called and said that "he could beat the case for $700.00 because he knows the people, *15 he will go in there and talk to them" and that the Indigent Defender "wouldn't get out of the office." Nader also told the husband that he could get the case cut down to "indecent something." Thereupon Nader told Mrs. Newton that he could get the charge reduced apparently to indecent exposure and that he could win the case because he had just won some others. He received $700.00 and thereafter continued to ask for more money, according to the grandmother.
The Commissioner found the testimony of the complainant quite believable and determined that indeed respondent had violated DR2-103(A) by soliciting. That finding was correct. The record fully supports the Commissioner's determination.
The foregoing conduct the Commissioner found was also a violation of DR1-102(A)6 (conduct which adversely reflects on his fitness to practice law). He was correct in this regard also.

BORROWING MONEY FROM CLIENTS
The Bar Association charged and the Commissioner found five disciplinary violations in respondent's borrowing money from clients.[8] In each instance he either was representing the client or had just previously concluded some legal matter.
In each of the five instances, except the Gorges incident, wherein the Committee did not charge defendant with violating DR5-104(A), the Commissioner found a violation of DR5-104(A) for Nader's having borrowed money from a client. With respect to this same conduct (borrowing) the Commissioner also found that Nader violated DR1-102(A)(1) (A lawyer shall not violate a disciplinary rule), DR1-102(A)(4) (which prohibits a lawyer's engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR1-102(A)(6) (engaging in conduct which adversely reflects on his fitness to practice law).
Because of Nader's financial problems he found it necessary to borrow money from his clients. In each instance Nader would appeal to the sympathy of a client to obtain a loan. For instance, in borrowing money from A.E. Johnson, he told Mr. Johnson that he needed a loan to send his daughter on a trip. On another occasion he borrowed *16 money from Mr. Johnson telling him that he needed money to buy his wife a television set. To induce Margaret Pursley to loan him money he relied on family illness. Both Mrs. Pursley and Mr. Johnson testified that Mr. Nader was crying at the time he sought the loans. When borrowing money from Shirley Lawson, Mr. Nader used a death in his family as the reason for the loans.
As for repayment, Nader promised his clients that their loan would be repaid in a short time. For example, the loan by Shirley Lawson was to be repaid in fifteen days. For the $2,800.00 borrowed from Haughton Wood Company over a three week period, he gave Haughton Wood Company a check dated twenty-five days after the last advance. The $1,500.00 he borrowed from Steve Johnson on December 22, 1982, he agreed to pay back five days later, on December 27th. The money he borrowed from A.E. Johnson on December 20, 1982 and December 21, 1982 he promised repayment six days later, by December 27, 1982. The Commissioner found, and the record supports the conclusion, that in each instance there was no reasonable possibility of Nader's repayment as promised.
For borrowing this money Nader was charged with violating DR5-104(A) which provides:
A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.
There are no Louisiana cases dealing with loans from clients as violations of DR5-104(A). The Bar Association has cited several cases and relies principally on In Re Conduct of Montgomery, 292 Or. 796, 643 P.2d 338 (1982). In that case a lawyer borrowed $20,000.00 from the two principal executives of a corporate client, a corporation not in the business generally of lending money, and furnished the client a promissory note which contained provision for a usurious rate of 20% interest, in circumstances in which he knew, or should have known, that the principal and interest would not be collectible.
That case is distinguishable from the one under consideration. Nonetheless, Montgomery is enlightening. The identical disciplinary provision, DR5-104(A)[9] was at issue in that case. The Oregon Supreme Court pointed out that DR5-104 contains four separate elements:
1) A lawyer shall not enter into a business transaction with a client if
2) they have differing interests therein and if
3) the client expects the lawyer to exercise his professional judgment therein for the protection of the client unless
4) the client has consented after full disclosure.
The Court noted that the first three clauses list requirements which all must be met before there is a violation of the Disciplinary Rule. The fourth clause, if the client consents after full disclosure, permits a transaction even though the first three elements are present. The Oregon Supreme Court concluded that a loan from a client is a business transaction and that the lawyer and client indeed did have different interests in the transaction, one as a lender and one as a borrower. And they concluded that the client in that case did indeed expect the lawyer to exercise his professional judgment for the protection of the client, not as relates to the creditworthiness of the borrower, i.e., the financial ability of the borrower to repay the loan and/or whether some security should be given, nor even relative to whether interest, and at what rate, should be charged. But they did find that the lender was relying upon Montgomery's exercise of professional judgment at least to the extent that a) the loan was to be valid and legally enforceable, and b) that *17 the documents prepared by him were to be in proper form and evidence a legally enforceable obligation. Having found the three listed requirements in the Disciplinary Regulations, they went on to find in the case there under consideration that the client had not consented after full disclosure.
As we view the case before us, Nader and his clients clearly had differing interests. And while not entirely clear, it might be concluded that he and his clients entered a "business transaction". The third requirement, that the client expect the lawyer to exercise his professional judgment therein for the protection of the client, is a bit more difficult. After a review of the facts, it is not at all clear that this third requirement was met. The circumstances surrounding the loans differed from the circumstances in the Montgomery case discussed above. Here, Nader made a pitiful plea seeking a loan for personal reasons and the clients loaned money with no more than an oral promise of repayment (in all but one instance). It is difficult to conclude that in this situation, where Nader was tearfully making a desperate plea for a personal loan, these clients were expecting him to exercise his professional judgment. It could possibly be argued that the unsophisticated client/lenders might have relied on him for their protection in some particulars, such as by signing a promissory note calling for some interest return. But this is not clear from the record, nor is it even a clearly reasonable inference from the facts.
We need not, however, in this case decide whether Nader violated DR5-104(A), entering a business transaction with a client, for the reason that the Commissioner was clearly correct in determining that such conduct was a violation of DR1-102(A)(4), engaging in conduct involving misrepresentation, and DR1-102(A)(6), engaging in conduct which adversely reflects on fitness to practice law; and for the further reason that these latter violations, coupled with the other professional misconduct discussed in this opinion, sufficiently support our determination herein that respondent should be disbarred.
In each instance the borrowing of money from a client was premised at least upon Nader's misrepresentation, when he led the client to believe he could, and would, repay the loan within very short time frames. Faced with his compelling need to bring home $2,500.00 each week and his scant legal income, Nader had no realistic expectation of repaying any of these clients within the periods in which he promised to do so. Furthermore this misrepresentation constitutes conduct that adversely reflects on defendant's fitness to practice law. DR1-102(A)(6).
For these reasons we agree with the Commissioner's findings with respect to the five instances concerning borrowing money from clients, that respondent was guilty at the least of violating DR5-102(A)(4) and DR1-102(A)(6).

CONCLUSION
Some of the violations of which we have found respondent guilty, standing alone, would perhaps not warrant the heavy discipline of disbarment. Several of them, however, would. And in combination these disciplinary violations cannot be viewed as anything less than very serious violations of the Disciplinary Regulations regarding lawyer conduct. At the very least, they seriously, adversely reflect on respondent's fitness to practice law. The protection of the public, the deterrent effect on other practitioners, the preservation of the integrity of the legal profession and the administration of justice require that respondent be disbarred and his name stricken from the rolls of attorneys licensed to practice law in the State of Louisiana.

Decree
For the reasons assigned it is ordered, adjudged and decreed that the name of Nesib Nader, be stricken from the Roll of Attorneys, and his license to practice law in the State of Louisiana be and it is hereby *18 revoked, respondent to bear all costs of these proceedings.
RESPONDENT DISBARRED.
LEMMON, J., concurs, but believes the committee also proved a violation of DR5-104(A).
NOTES
[1] Twenty-eight charges were explored in two Commissioner hearings on March 2, 1983 and August 29 and 30, 1983. Nine of them were dismissed by the Bar Association, three the Commissioner found were not proved, and one the Commissioner found not to be an ethical violation.
[2] DR5-104(A)
[3] DR2-106(C)
[4] DR6-101(A)(3)
[5] DR2-103(A)
[6] The eight violations are as follows:

a) J.D. Young employed Nader to handle his son's criminal appeal for a fee of $1,000.00. He agreed with Young that he would return the $1,000.00 if the appeal was not successful. Young discharged Nader between one and two weeks after he was employed for reasons which included Nader's attempt to borrow $700.00 from him. After being discharged, Nader gave Young a check for $1,000.00 which was dishonored because of insufficient funds. A later check for $1,200.00, for repayment of the fee, was also dishonored.
b) On December 23, 1982 Nader accepted $350.00 from Sharon Rhine to represent her husband in a criminal matter. The written agreement said that Nader would have her husband released from jail by December 27, 1982 or that he would refund the money. He was not released nor was the money refunded. To pacify her Nader agreed to pay her an additional $100.00 or $450.00 on January 6, 1983. Nader has not paid Rhine any of the money.
c) Franklin Davis hired Nader to represent him in a criminal case for a $700.00 fee. Nader gave him a receipt to the effect that he would refund the fee if he lost the case. The original agreement was that the total fee would be $1,000.00 but only $700.00 would have to be paid until he went to court. Nader kept calling Davis asking for more money and Davis sent an additional $200.00. Davis discharged Nader. Nader agreed to refund the $700.00 and had another client, Andrew Johnson, issue a check for the $700.00. This check was dishonored due to insufficient funds, and Davis has never received the $700.00 refund.
d) Dorothy Robinson, Rhonda Noyes and Annie George hired Nader to represent them in criminal proceedings. He gave them a receipt for $1,200.00 which said "no time no sentence." After pleading guilty, the clients paid Nader another $260.00 and received a receipt which said, "to obtain probation and/or fine." He agreed to refund the fee but has not done so.
e) Dana Greeson employed Nader to represent him on a DWI charge and paid $200.00. He paid an additional $300.00 at a later time and received a letter stating, "For an additional $300.00, you will not serve time." Nader was discharged the next day.
f) Nader told Norwell Newton, the grandfather of Calvin Willis, a defendant charged with aggravated rape that "he can beat the case for $700.00 because he knows the people, he will go in there and talk to them." Nader also told Newton he could get the case cut down to "indecent something." Nader continued to ask for more money after originally being paid $700.00.
g) Billie Jean Lewis employed Nader to represent her son, Jerry, in a criminal matter. She paid $400.00 and received a receipt from Nader which stated "If I fail to reduce charge and obtain probation, this AMT be refunded." Lewis pled guilty and received a twenty-five year sentence. The money was never refunded.
h) Odis Haymon employed Nader in a criminal case and paid an initial fee of $750.00. Nader continued to ask for more money and was eventually paid a total of $1,275.00. On one occasion, Hayman was told that Nader would refund $375.00 if the case was lost. Nader eventually refunded the money to a woman Haymon lived with at one time.
[7] The two instances are as follows:

a) Nader was employed by Evelina Gant to file suit on her behalf seeking ownership of a piece of property. The suit, although prepared, was never filed.
b) Keith Toney paid Nader $300.00 to obtain a restricted driver's license. Nader prepared a petition but never filed it. Toney contacted Nader after receiving a letter from the police regarding the license and Nader told him the suit had been filed. Toney, who received a ticket for driving under suspension, proceeded to obtain the hardship license on his own. Nader agreed to assume any costs of the fine resulting from the ticket and agreed to refund $400.00 to Toney by April 20, 1983. Nader did not refund the money.
[8] The five instances are as follows:

a) Nader represented Lawson in connection with the succession of her father. The succession was completed on January 29, 1982; Lawson received funds in excess of $6,000.00 from the succession; Nader was aware that she received the funds; three days later he borrowed $2,000.00 from her. He has repaid $500.00 and still owes her $1,500.00.
b) Nader handled legal matters for one Irene Gorges for which he earned $400.00 in connection with succession work and $100.00 for work on a criminal matter. During the course of representation he attempted to borrow $2,000.00 from Mrs. Gorges and on another occasion attempted to borrow $1,500.00. He did borrow $150.00 from her on January 12, 1982. He has not repaid the $150.00. Since the Committee did not specifically charge him with violating DR5-104(A) the Commissioner simply found him guilty in this regard of violating DR1-102(A)(1).
c) Nader was employed by Margaret Pursley and Haughton Wood Company to defend a lawsuit. He was paid a $950.00 fee. During the course of representation he borrowed $2,800.00 from Haughton Wood Company. As evidence of the debt he signed a check for $2,800.00 drawn on the Bossier Bank and Trust Company. The check was returned unpaid because Nader did not have an account at the Bossier Bank and Trust Company. After he was discharged by the client they sued him, took a judgment for the $2,800.00 plus $400.00 in unearned attorney's fees. Nader has paid $150.00 on the judgment.
d) Steve Johnson employed Nader to represent him in a divorce proceeding. When Johnson received some money which was back pay for an unemployment dispute, he told Nader that he had received $2,100.00, whereupon Nader borrowed $1,500.00 from him. Nader agreed not only to pay the $1,500.00 back in five days, but also to pay alimony owed by Mr. Johnson, $250.00 which was going to be due a few days after the loan was completed. Nader had not repaid the money at the time of the hearing before the Commissioner. At the Commissioner's second hearing on August 29, 1983 he introduced an affidavit indicating that he had paid Mr. Johnson the $1,500.00.
e) On the date Nader was employed by Steve Johnson he learned that Steve had borrowed $300.00 from his father, A.E. Johnson. Nader called A.E. Johnson and borrowed $300.00 from him on December 20, 1982 and $250.00 on December 21, 1982. The Commissioner found that he did not repay any part of the loans. In brief to this Court Nader contends that he has now repaid Mr. Johnson the $550.00.
[9] The Code of Professional Responsibility of the Louisiana Bar Association as restated on March 9, 1971 was in many particulars patterned on the ABA Model Code of Professional Responsibility.