**In re David A. SHEFFIELD, Debtor.**

**Norma W. TEEKELL, as Trustee of the James Carson Stone, Jr. Trust, Eloise Gertrude Stone Simon Trust No. 1, and the Eloise Gertrude Stone Simon Trust No. 2, Plaintiffs,**

v.

**David A. SHEFFIELD, Defendant.**

**Bankruptcy No. 92BK–80560.
Adv. No. 92AP–8051.**

United States Bankruptcy Court,
W.D. Louisiana,
Alexandria Division.

April 21, 1995.

Gary W. Partney, Alexandria, LA, for debtor.

Dan E. Melichar, Alexandria, LA, for plaintiff.

### REASONS FOR DECISION

HENLEY A. HUNTER, Bankruptcy Judge.

This matter comes before the Court after trial on the merits of the plaintiffs' complaint to determine the dischargeability of certain debts allegedly due the plaintiffs by the debtor. This is a Core Proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has jurisdiction pursuant to 11 U.S.C. § 1334 and by reference from the District Court pursuant to Local District Court Rule 22.01 incorporated into Local Bankruptcy Rule 1.2. No party at interest has sought to withdraw the reference to the Bankruptcy Court, nor has the District Court done so on its own motion. This Court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. Pursuant to these Reasons, there will be judgment for the plaintiffs.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Debtor, David A. Sheffield, filed for relief under Chapter 7 of the United States Bankruptcy Code on April 14, 1992. A Complaint Objecting to Dischargeability of Debt was filed by Norma W. Teekell on July 22, 1992. The parties have stipulated that Sheffield executed the following notes, mortgages, and reformation agreements which are the basis of the plaintiffs'· claims:

1. Promissory note dated September 24, 1979, payable to Viola C. Stone in the principal amount of $60,000.00 and providing for 15% per annum interest from date until paid, payable in 120 monthly installments of $967.98 each and secured by a mortgage executed by David A. Sheffield dated February 1, 1979, in the principal amount of $75,000.00 together with 10% interest from date of execution payable on demand to Future Holders secured by Act of Mortgage recorded February 1, 1979, at Mortgage Book 846, page 705 of the records of Rapides Parish, Louisiana, as modified in Agreement for Reformation of Promissory Note and Mortgage dated December 31, 1986, and filed and recorded at Mortgage Book 1081, page 356, of the records of Rapides Parish, Louisiana. [Secured by mortgage on various tracts referred to hereafter as the "Timberland"]. Exh. P-1.

2. Promissory note executed by defendant October 15, 1975, payable to Future Holders in the amount of $41,325.60 representing a principal loan of $25,000.00 together with 10% per annum computed over 120 pay periods and secured by a certain mortgage on property described therein and later as reformed in an Agreement for Reformation of Promissory Note and Mortgage filed and recorded at Mortgage Book 1081, page 364 of the records of Rapides Parish, Louisiana. [Secured by mortgage on property referred to hereafter as the "Giamanco Street property"]. Exh. P-2.

3. Promissory note dated May 6, 1980, payable to Future Holders in the principal sum of $30,000 providing for 14% per annum until paid and payable in 120 monthly installments of $465.80 each secured by Act of Mortgage recorded May 6, 1980, at Mortgage Book 884, page 660 of the records of Rapides Parish, Louisiana, and as modified in Agreement for Reformation of Promissory Note and Mortgage recorded at Mortgage Book 1081, page 362 of the records of Rapides Parish, Louisiana. [Also secured by the "Giamanco Street property"]. Exh. P-3.

4. Promissory note executed September 12, 1980, payable to Viola Stone in the principal sum of $50,000.00 providing for 15% per annum interest from date until paid, payable in 144 equal monthly installments of $750.45 each secured by a mortgage note of David A. Sens, et ux in the principal amount of $50,000.00 and secured

by an Act of Mortgage dated July 1, 1980, and recorded at Mortgage Book 890, page 380 of the records of Rapides Parish, Louisiana, as modified in Agreement for Reformation of Promissory Note and Mortgage filed and recorded at Mortgage Book 1081, page 366 of the records of Rapides Parish, Louisiana. [Secured by the "Sens note," affecting the "Sunset Acres/Wheelock Street property"]. Exh. P–4.

## I.

### Background

The promissory notes were originally held by Mrs. Viola C. Stone. Mrs. Stone was married to John Walter Stone, who died in 1957. They had two children, James Carson Stone and Eloise Gertrude Stone Simon. The daughter, Eloise, was declared an Interdict in 1956. The son, James Carson Stone, died March 23, 1981, approximately one year prior to the death of Mrs. Stone, who died on March 27, 1982. James Carson Stone, was survived by James Carson Stone, Jr.

Mrs. Stone left a will dated April 6, 1981, which was admitted to probate in the "Succession of Viola Carson Stone," Docket No. 20,639. Lloyd G. Teekell was appointed Executor. The will created trusts in favor of James Carson Stone, Jr., Mrs. Stone's grandchild, and Eloise, her surviving daughter. Norma W. Teekell was appointed Trustee of all the trusts. Suit was filed in the Ninth Judicial District Court for Rapides Parish, Louisiana, under Docket No. 164,262, styled "James C. Stone, Jr. Trust, et al. v. David Sheffield, et ux" on May 22, 1991, by Norma W. Teekell, as Trustee of the James Carson Stone, Jr., Trust and the Eloise Gertrude Stone Simon Trusts, against Sheffield and his wife, Linda Sheffield. A reconventional demand for damages was filed in the state court matter by Linda Sheffield on the basis that she was not a proper party defendant, inasmuch as she was not married to Sheffield at the time the notes were executed. Mrs. Sheffield also asserted that she was separate in property from him by virtue of a recorded marriage contract, although she had signed the reformation agreements.

Ultimately, after trial, findings were entered in favor of plaintiffs against Sheffield. Plaintiffs' demands against Linda Sheffield were rejected but there was no recovery on her reconventional demand. Prior to the entry of a judgment, Sheffield filed these bankruptcy proceedings. Pursuant to Reasons for Decision entered on November 24, 1992, this Court lifted the automatic stay to permit the parties to return to state court and proceed to final judgment. All issues relating to the dischargeability of any debt and the enforcement of any judgment against the debtor or property of the estate were reserved to this Court.

The judgment was eventually signed on December 4, 1992, in favor of the James Carson Stone, Jr., and Eloise Gertrude Stone Trusts. Exh. P–6. An amended judgment was signed December 22, 1992, substituting James Carson Stone, Jr., as plaintiff in the place of Norma W. Teekell as Trustee of the James Carson Stone, Jr., Trust, because such trust had reached its term in 1987. Exh. P–5. The judgment is now final.

Sheffield died on June 30, 1994. By order of this Court dated December 22, 1994, his son, Gary Sheffield, was substituted as party defendant in his capacity as Administrator of the Succession of David Sheffield, whose succession was opened under Probate No. 28,-275, 9th Judicial District Court, Rapides Parish, Louisiana.

## II.

### Contentions of the Parties

Plaintiff contends that:

1. That Sheffield was at all pertinent times acting as attorney and counselor at law to Viola C. Stone, representing her in various legal matters. Further, Sheffield alleges debtor breached a fiduciary duty and obligation owed Mrs. Stone and violated provisions of the Code of Professional Responsibility and the American Bar Association Canons of Ethics by entering into business transactions with the client at a time when he was acting contrary to her best interests. Thus, plaintiffs assert nondischargeability for a defalca-

tion while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4).

2. The debts should be excepted from discharge because they were obtained by false pretenses, false representations and/or actual fraud. In particular, plaintiffs assert that the original notes were usurious on their face, that Sheffield knew this, and, further, that security for the loans was inadequate. Thus, the debts are nondischargeable under 11 U.S.C. § 523(a)(2).

3. That the actions of Sheffield constituted a willful and malicious injury under 11 U.S.C. § 523(a)(6).

Although Sheffield maintained that the defenses of usury, prescription, or peremption applied in the state court action, and, indeed, would be deprived of those defenses by this Court's permitting the state court litigation to proceed to judgment, Counsel for debtor conceded in oral argument that debtor does not presently urge those defenses in this action. *See* Reasons for Decision, November 2, 1992.

## III.

### Burden of Proof–Dischargeability

■ The burden of proof in an action to determine the dischargeability of actions under 11 U.S.C. § 523 is the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In that matter, the Supreme Court observed:

The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts— such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud. Requiring the

creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests.

498 U.S. at 287, 111 S.Ct. at 659.

Under 11 U.S.C. § 523(a)(2), a discharge under 11 U.S.C. § 727 does not discharge a debtor from any debt for money, property, services, or an extension, renewal or refinancing of credit, obtained by fraud. Further, under § 523(a)(4), debts arising from embezzlement, larceny, or defalcation or misappropriation while in a fiduciary capacity are nondischargeable. Under § 523(a)(6), debts for willful and malicious injury to another entity or the property of another entity are likewise excepted from the discharge. Collectively, these are the so-called "fraud exceptions" to the discharge.

## IV.

### Summary of the Evidence

#### A. Debtor's Testimony

These reasons will begin with debtor's own statements concerning the relationship between himself and Mrs. Stone. Sheffield was, of course, deceased by the time of the trial in this Court. However, he testified in the state court suit on the promissory notes and reformation agreements. *See* Transcript, Exh. D–4(b). Sheffield testified as follows:

Q. Okay. And Mr. Sheffield, isn't it true that you were Mrs. Stone's personal attorney from 1967 through the time of her death?

A. I did work for her, but I wasn't the only attorney who handled matters for her.

Q. Okay, sir. But is it true that you did legal work for Mrs. Stone at least from 1967 through the date of her death? I mean, for business other than your personal loans, sir? Your loans from her.

A. Oh, yes, she would ask me to draw up a mortgage when she lent ... she was in the business of lending out money to various people. And she would from time to time have these people

have their attorney, or either have my attorney. She would designate what she wanted in it and was very familiar with herself [sic].

Q. Okay. And the point is you did act as attorney for her from at least 1967 through the date of her death and collected legal fees during that time for your work?

A. For what work that she had me do— the other lawyers that did work for her too.

Exh. D–4(b), p. 43, Lines 12–31.

### B. Early Associations

Mr. Leonard Fuhrer, who was admitted to the Louisiana Bar in 1952, first met Sheffield during a period when both were associated with the Gravel firm in the late 1950's and early 1960's. During that time, Fuhrer became acquainted with Mrs. Stone, who was in the office from time to time to see Sheffield. Fuhrer understood that Mrs. Stone invested in mortgage notes, and believed that Sheffield was the source of this information. In fact, Fuhrer had financed a house he sold and was interested in selling the note. Mrs. Stone purchased the note at a discount from him in approximately 1961.

Fuhrer acknowledged that he did not see Sheffield actually prepare any documents for Mrs. Stone and had no personal knowledge of what passed between them. However, his general impression was that Sheffield was Mrs. Stone's lawyer. Fuhrer did not know Mrs. Stone's husband. Also, Fuhrer could not recall Mrs. Stone having any contact with firm members other than Sheffield, and did not personally perform any services for her. He acknowledged that Exhibit D–2(1), consisting of a copy of the pleadings in a lawsuit styled "Viola Carson Stone v. James D. Simon," in which Mrs. Stone appeared as the Curatrix of the Interdict, Eloise Stone Simon, filed under Docket No. 47,554, 9th Judicial District Court, reflects that Camille F. Gravel, Jr., appeared on behalf of the defendant Simon in 1956. Another firm represented Mrs. Stone in that matter.

Lloyd Teekell, formerly the Executor of Mrs. Stone's estate, testified that he practiced law in Rapides Parish for 28 years prior to his election to the 9th Judicial District Court in 1978. Teekell retired on December 31, 1990. He was acquainted with Mrs. Stone for many years and on occasion represented her as her lawyer. He also knew her late husband, John Walter Stone. Teekell handled Mr. Stone's succession after his death in 1957. Exh. D–5. Mrs. Stone was also a political supporter of Teekell who served in the state legislature in the late 1950's. Teekell had known David Sheffield since the former came to Alexandria in the early 1950's to practice law. As a former architectural student, Sheffield also was familiar with real estate and always had an interest in houses and remodeling them.

Teekell stated that he had performed legal work for Mrs. Stone, consisting of at least one will. She updated her will from time to time after consultation with Teekell. Teekell testified that Mrs. Stone also engaged in a number of real estate loan transactions. She needed title opinions in connection with same, but he did not "encourage" that type of work. From time to time she would use other lawyers. For example, when a person she loaned money to was already represented by counsel, she would use theirs to prepare documents. He understood Sheffield was her "primary" lawyer in such matters. Teekell knew that Sheffield often visited her since he owned the Greenbrier Motel on the Lake Charles Highway next to Mrs. Stone's residence. Teekell described her as "tough about getting adequate security."

Documentary evidence suggests that Mrs. Stone or her estate was the vendor, mortgagee, or other party to sixty-eight (68) transactions involving real estate from 1956 to 1986, including the mortgages and reformation agreements at issue. Teekell himself was the notary on three of those transactions.

Sheffield was the notary on the following transactions:

(1) Mortgage by Wilfred J. Dauzat dated April 1, 1975, to Future Holder, for $14,000, payable in 60 installments of $297.46 each, beginning on or before May 1, 1975, with 10% interest from date, and recorded April 17, 1975, rec-

ords of Rapides Parish, Louisiana. Exh. P–22.

(2) Mortgage by Sirwelton Hobbs, a single man, to Viola C. Stone, dated September 6, 1980, for $6,740, with 15% interest from date payable in 57 installments of $166.53 beginning on the 10th of each month beginning October 10, 1980, and recorded October 16, 1980, Rapides Parish, Louisiana. Exhs. P–19(B) and D–1(36)

(3) Mortgage by Everett Christopher Hobbs dated June 25, 1981, to Viola C. Stone for $26,000 bearing interest at the rate of 15% payable in 192 installments of principal and interest in the amount of $357.97 per month beginning August 1, 1981, dated June 25, 1981, and recorded June 30, 1981, Rapides Parish, Louisiana. Exhs. P–21 and D–1(41).

(4) Agreement for Reformation of Promissory Note and Mortgage executed by Everett Hobbs and Irene Hobbs to Estate of Viola C. Stone, represented by Lloyd G. Teekell, Executor, reforming an original promissory note for $26,000, providing for 15% per annum interest from date until paid, payable in monthly installments of $357.97, secured by an Act of Mortgage, recorded June 30, 1981, in Mortgage Book 916, Page 641, records of Rapides Parish, Louisiana. Reformation agreement is dated June 24, 1982, and recorded July 24, 1987, records of Rapides Parish, Louisiana. Exh. D–1(48).

Sheffield issued a title opinion to Mrs. Stone concerning the Dauzat loan dated April 14, 1975. Exh. P–23. He earlier issued a title opinion on a Wilfred J. Dauzat loan dated April 3, 1967, on which he was not the notary. Exh. P–24. Mrs. Stone appears to have made loans in 1968 to Mr. Dauzat in which Sheffield was not the notary. Exhs. D–1(9) and (10). Sheffield forwarded Mrs. Stone a mortgage certificate issued by the clerk of court concerning the Sirwelton Hobbs loan. Exh. P–20.

Mrs. Stone was also involved in substantial litigation. She commenced the Interdiction of Eloise Stone Simon in 1956, which was handled in part by Teekell. Exh. D–7. In fact, Teekell himself purchased property from the Interdict's estate and signed the necessary pleadings as attorney for Mrs. Stone in 1957. In 1970, court authorization was sought in the Interdiction Proceedings to sell to Sheffield the interest of the Interdict in a tract located adjacent to her mother's residence for $3,000, $500.00 cash and the balance in a credit sale. Another attorney, Knight E. Doggett, executed these pleadings.

Sheffield then appeared as attorney for Mrs. Stone in the Interdiction by filing a Petition for Authorization of Donation by the Curator in 1977. Exh. P–25. His July 14, 1977, notes, in his distinctive handwriting, contemplate not only a donation but a will to be executed by Mrs. Stone relating to the disposition of mortgage notes and real estate to·decedent's children. Exh. P–27. He forwarded copies of the judgment approving the donation to Mrs. Stone on August 9, 1977. Exh. P–26. Sheffield's involvement in the Interdiction matter continued following the death of Mrs. Stone. Sheffield prepared pleadings in the Interdiction matter as late as 1987, to appoint Norma Teekell as curatrix of both the person and the property of the Interdict (the original designee under Mrs. Stone's will having declined the appointment).

Other suits were filed involving Mrs. Stone in Rapides Parish resulting from a sheriff sale of property owned by one Dillard Cloud. The property was allegedly exempt, and therefore, wrongfully seized, pursuant to a *writ of fieri facias* issued in Allen Parish. Exhs. D–2(2), 2(3) and 2(4). These matters were litigated at the trial and appellate levels in the early 1960's. Sheffield made no appearances.

### C. Mrs. Stone's Will

On assuming the bench February 23, 1979, Teekell closed out his extensive law practice. Since he was unopposed and his practice large, he had a "heck of a time closing it out, ... work[ing] night and day to try to close out his practice." Teekell stated that he left many rough drafts of documents for clients. He estimated he prepared over 1,000 wills in his practice. Teekell's only associate at the

time he assumed the bench was Mr. Gary Partney, who appeared in this matter as Counsel for debtor. Teekell maintained a list of over 350 wills he had prepared at the time of terminating his practice, including a copy of a will for Mrs. Stone. Exh. D–8. This will is listed as # 304. The listing of a "copy" following the number suggests to Teekell that Mrs. Stone's lockbox contained the original. He understood that Mrs. Stone's reliance on Sheffield for legal advice increased after Teekell assumed the bench.

After he closed his practice, Teekell recalled that Mrs. Stone discussed updating her will with him. He advised her he could not handle it. His wife Norma made arrangements to hire another lawyer. Over the years, Mrs. Stone made a number of changes in her will. Even after taking office, Teekell had occasion to "look through files" and refer Mrs. Stone to other lawyers, but did not recall any specific conversation with Mrs. Stone about her will in June 1979. Further, he did not remember seeing Exhibit D–9, a draft of a will dated at that time. He noted some blanks in the document, such as names for Mrs. Stone's granddaughters. Teekell opined he would not have left those names blank, since he knew them personally. He suggested that if his former secretary, Georgia Wolff, stated she was asked to prepare a draft of a will in June 1979, she was mistaken about the date. *See* also Exh. D–10. Teekell did not recall whether his half-brother, John A. Meyers, whose nickname was John Black, was hospitalized in June 1979. Black pencil marks on the document are not his handwriting.

Norma Teekell, wife of Lloyd Teekell, testified that she first met Mrs. Stone in the late 1950's. Lloyd Teekell, Norma Teekell, and Mrs. Stone became very close friends. Mrs. Stone had health problems, including an aneurysm. Mrs. Teekell drove her to Houston, Texas, for surgery and other medical treatment. As Mrs. Stone grew older, she asked Mrs. Teekell for help more frequently. In fact, she insisted that Mrs. Teekell have her power of attorney and a key to her safety deposit box. Mrs. Teekell described Mrs. Stone as alert and ambulatory until a month before death and her "mind [was] always

good." Mrs. Teekell, however, was not involved in Mrs. Stone's lending affairs. She was, however, at the Stone residence on occasion when people came by to make their payments.

According to Mrs. Teekell, Sheffield visited Mrs. Stone frequently and performed some chores around the Stone residence. She recalled mention of Sheffield's camp on Lake Cotile. Sheffield, his first wife, the Teekells, and Mrs. Stone socialized. On one occasion, they went to Sheffield's home for fried turkey. Sheffield took Mrs. Stone to Houston for medical treatment on one occasion when Mrs. Teekell could not go. Mrs. Stone once planned a large dinner party for her granddaughters at a local restaurant. The Teekells and the Sheffields were present.

After Lloyd Teekell assumed the bench, Mrs. Teekell recalled that Mrs. Stone would often approach him for "free legal advice." Mrs. Stone was particularly concerned that her daughter, the Interdict, receive alimony from her ex-husband. When Teekell went on the bench, Mrs. Teekell became his court reporter. She was occasionally assigned to other judges. After Teekell's retirement, she went to work in the District Attorney's office.

After her son's death, Mrs. Stone was very upset and asked Mrs. Teekell to make the funeral arrangements. Mrs. Teekell was appointed administratrix of his estate, which Sheffield handled. Exh. P–31. Mrs. Teekell selected Sheffield for this task since she thought he was the attorney for both mother and son. James Carson Stone had predeceased his mother by one year.

Another revision to Mrs. Stone's will was required, since her son could no longer serve as co-executor. In fact, Mrs. Stone discussed her will with Mrs. Teekell on numerous occasions. Mrs. Teekell would take notes, using an old will as a form. She asked Mrs. Teekell to find someone other than Sheffield to prepare the revision. Mrs. Teekell thought this request odd since Sheffield was, in her view, Mrs. Stone's attorney. Mrs. Teekell called Richard Chaudoir. Mrs. Teekell recalled driving Mrs. Stone to Chaudoir's office to have the will signed. On the same date, she remembered taking Mrs. Stone to her

CPA's office to discuss income tax matters. The final will did not mention an earlier bequest of a cut glass punch bowl to Mrs. Teekell, since Mrs. Stone earlier made a manual gift of same.

Mrs. Teekell recalled that Mrs. Stone had a large medical bill, which Medicare refused to pay. Sheffield handled the matter, and won the case. However, knowledge of the victory was not known until just after Mrs. Stone's death. Mrs. Teekell recalled telling Sheffield how pleased Mrs. Stone would have been if she had known. This conversation took place just before or after the funeral.

Georgia Wolff testified that she was first employed by Teekell in 1974, as a secretary. In the practice, she worked in real estate, and typed whatever other documents that required. She also prepared wills. Often, she typed the wills by copying forms Teekell would provide her or he dictated on a dictaphone. She acknowledged some ability to prepare a draft of a will without substantial guidance. Wolff was also a notary. When Teekell was elected to the bench, Wolff "followed him," working in the capacity of minute clerk. She continued, however, to perform services for Teekell, including personal matters. Wolff knew Mrs. Stone and recalled her coming to the office in the courthouse at least once. In June 1979, Teekell stated he needed a will drawn up. It contained trusts she recalled. She typed several drafts. Wolff recognized her handwriting on a draft bearing the typewritten date of June 1979. Exh. D–9.

Questioned about D–10, an unsigned will dated June 1979, Wolff "imagine[d]" this to be the "final form." Another draft, Exh. 10–A, appeared to be a copy of Exh. D–10. She identified certain notes on these documents as Teekell's. She also stated that she knew his handwriting well. She insisted that these documents were typed on the typewriter she was assigned at Teekell's courthouse office.

Wolff recalled that she was instructed to take the "final" version of the 1979 will to Mrs. Stone's residence. Wolff drove in Teekell's car and was invited in the house to visit. Mrs. Stone said she did not intend to sign that particular will. Wolff advised Mrs. Stone to discuss the matter with Teekell, and left the will at the house. This was the only time Wolff was in the Stone residence. Wolff recalled the incident "vividly," because afterwards, she went directly to her own home from the Stone residence. There, Wolff picked up her son and took him to the hospital. Coincidentally, Norma Teekell arrived at the hospital while she was there with John Black, Teekell's half-brother.

On cross-examination, shown yet another will on which she was the notary for Mrs. Stone signed June 6, 1979, Wolff recognized her signature and identified the witnesses, one of whom worked in Teekell's old law office and the other in Gary Sheffield's office. However, Wolff had no independent recollection of the June 6, 1979 will or the circumstances surrounding it.

Mr. Richard E. Chaudoir, another Alexandria attorney, was the notary on Mrs. Stone's 1981 will which was admitted to probate. Chaudoir was previously associated with Teekell and was his partner in the past. He testified that he was aware that Mrs. Stone was a client of Teekell's. He recalled possibly making some amendments to the 1981 will prior to its execution. However, he does not believe he was the original "draftsman" and only worked from a copy of an earlier will. Chaudoir considered himself an "accommodation preparer." He did not generally draft wills involving trusts and would not do it today. The witnesses on the 1981 will are Chaudoir's wife, Suzonne, and Leslie Lampert, then the wife of another Alexandria attorney, Marc Lampert, and Lampert's secretary at the time. Chaudoir stated that the 1981 will appeared to have been prepared on an Olivetti memory typewriter used in his office at the time.

Chaudoir did not recall being contacted by Teekell to discuss a will for any of his former clients, and believed that this will resulted from a contact from Norma Teekell. He did not recall seeing Exhibits D–9 or D–10 before, although the latter is similar to forms he would have used. In practice, he continued to utilize Teekell's forms he obtained during their earlier association. He did remember some contact with Teekell subsequent to Mrs. Stone's death. He also re-

called that Norma Teekell may have referred yet another of Teekell's former clients, a Dr. Powell, to him to prepare a will.

### D. The Succession

At the time of Mrs. Stone's death in March 1982, Teekell stated she was approximately ninety-one or ninety-two years of age. He recalled only one will being found in the inventory of the bank box, that being the one that was admitted to probate. It designated Teekell as the executor of Mrs. Stone's estate. No attorney for the executor was designated in the will. Teekell engaged Sheffield as his attorney to handle the estate, due to his belief Sheffield was Mrs. Stone's attorney and the latter's familiarity with her business affairs.

After appointment as executor, Teekell commenced administration of the estate, which he stated remained under administration from 1982–1986. The heirs were the Interdicted daughter, Eloise, and James Carson Stone, Jr. A few personal possessions were left to grandchildren. The remainder of the estate was left in trusts.

Unbeknownst to Teekell prior to Mrs. Stone's death, Sheffield was also a debtor of the Stone estate. This was discovered, to Teekell's "surprise," on an inventory of Mrs. Stone's bank box. While Teekell acknowledged that Mrs. Stone made other loans, he testified over one-half of her total estate was loaned to Sheffield.[1] The "Mortgage Note List" filed in the Succession lists twenty-five notes. Exh. D–3. In fact, the majority of notes held by the succession were usurious on their face.

Three of Sheffield's notes were secured by special real estate mortgages and another secured by a pledge of a mortgage note executed by an individual named Sens. See, supra, page 2. The first, a $60,000 note secured by a mortgage on an undivided fractional (13/96) interest in raw, cut-over land (the "Timberland"). The second and third both affected portions of real estate on Giamanco Street in Alexandria. According to Teekell, there was some "overlapping" of the mortgages on this property resulting in a "double mortgage." The fourth, the "Sens" note, is discussed infra. An unsecured note for $10,000 was eventually "plowed under," according to Teekell, for Sheffield's fee in handling the succession. Exh. D–6.

As executor, Teekell made an effort to collect all types of agreements. Teekell reviewed records and determined that Sheffield was current on his obligations to Mrs. Stone at the time of her death. However, Sheffield promptly became delinquent and insisted that the notes were usurious on their face. Sheffield claimed that his only liability was for the principal amount of the loans. Teekell thought Sheffield would be estopped from pleading usury, and, later that prescription had run on the usury defense. Only Sheffield raised usury as a defense to the payment of the notes, but Teekell was concerned that others might do so also. Teekell recalled expressing some concern to Mrs. Stone prior to her death about the rate of interest on notes she held. However, Sheffield assured Mrs. Stone they were enforceable.

According to Sheffield's testimony, he stated that Teekell and himself reviewed some "fifteen or twenty documents and ... were greatly concerned that perhaps the estate would lose a lot of money if something happened to one of those notes" that were usurious. Exh. D–4(b), p. 17, Lines 17–20. Thereafter, Sheffield rendered an opinion to Teekell and explained a procedure for reforming all the notes, including his own. Id. at Lines 26–31.

Sheffield's formal opinion letter, dated June 28, 1982, purports to review "various conventional loans made by decedent in the past few years." Exh. P–7.

---

1. Teekell indicated similar surprise in the state court trial. Transcript p. 62, Lines 17–21. However, Teekell's recollection of the amounts loaned to Sheffield relative to the succession assets is slightly overstated. The detailed description list in the succession lists assets exceeding $354,000.

Notes comprised over $342,000 of that amount. Sheffield's notes totalled $141,866.22 or 40% of the gross estate. Even after adjustment for estate liabilities, the Sheffield loans constitute approximately 45% of the estate.

Sheffield opines:

"[T]here is little question but the interest rate stated and charged was in excess of simple conventional interest from date of execution...." Applying the principles of the Paulat [vs Pirello, 353 So.2d 1307 (La. Sup.Ct.1978)] case to the mortgages involved in the Viola C. Stone Succession, there is no question but that the interest expressed on the face of the mortgages is usurious. This being so, under the provisions of [La.] R.S. 9:3501 all sums collected as interest which would be usurious would be forfeited to the borrower. The procedure involves giving a credit to the borrower of all interest collected on the principal, thereby reducing the principal, thereby reducing the principal indebtedness. In view of the fact that the various mortgage holders are not delinquent, there would be no way of making a demand for the remaining principal indebtedness upon the basis of a default as was indicated in the Paulat case. I suggest the possible procedure of contacting the various mortgagors with the view in mind of changing the interest rate and the payment schedule, so that at the date of the execution of the mortgage, the interest rate would be consistent with the maximum conventional simple interest rate then in effect in accordance with our law. This, of course, would be done in the nature of a settlement with all parties on an amicable basis.

Exh. P–7.

In the earlier trial in state court, Teekell described his efforts to renegotiate the notes with Sheffield as follows:

Q. Did you and Mr. Sheffield discuss the term of prescription?

A. Yes. At some point later on after two, three or four years had elapsed and I just never could get him to do anything toward paying these notes. I finally, of course in desperation pushed him and gave him some deadlines within which he had to do something and then indeed he again broached the situation of usury. And I explained to him that of course there was a two year prescription and more than two years had elapsed since he had paid any quote "usurious interest"

endquote, if indeed it ever was. And that therefore that was moot.

Exh. D–4(a), p. 57, Lines 10–20.

Teekell could not recall in the state court trial how soon after Sheffield commenced handling the estate the usury issue was raised in Sheffield's formal opinion. In Teekell's words:

"[T]his went on for so many years and I became so frustrated with Mr. Sheffield till I just I don't remember it. I think it was fairly soon after he commenced representing the estate, as I recall."

Transcript 68, Lines 12–15.

Sheffield acknowledged that all his promissory notes and loan documents regarding his loans from Mrs. Stone were prepared in his office. *Id.* at p. 43, Line 2.

### E. The Reformation Agreements

Ultimately, a "Petition to Compromise and Reform Mortgage Obligations" was filed in the Succession, after its preparation by Sheffield. He also signed the petition which referred to seven notes, four of which were Sheffield's own obligations. A court order was obtained authorizing the reformation. Exhs. P–14, D–3. Similarly, all of the reformation agreements were prepared and signed in Sheffield's office. *Id.* at p. 54, Lines 6–8.

The reformation agreements were themselves fraught with another controversy between Sheffield and Teekell. Teekell claimed that if the estate had been paid regular monthly payments, that amount could have been invested at interest. Thus, the reformed agreements contained, at Teekell's insistence, additional interest. *Id.* at p. 26. Worksheets calculating the amount of interest were prepared on each note. Sheffield himself described the situation as follows:

A. We had no problem until Mr. Teekell came up with that additional thing because they hadn't been making those payments. He said, "ought to get something extra because you haven't been making them."

Q. But you were already paying him the legal interest rate?

A. It was computed in there. We had a big argument about that and he said "that's the way we're gonna do it, you understand." And I had no other way *... I didn't think it was ethical to start telling him in the middle ... I'm handling that estate,* that "You pop your whip and I'll pop mine and I won't pay no interest." And I didn't realize what it was until after we sat it down. And we did this in about a couple of hours—arguing in my office about it. He says, "That's the way you're gonna do it."

Exh. D–4(b), pp. 30–31, Lines 24–5 (emphasis supplied).

Nonetheless, with the approval obtained from the state court in the succession proceeding, the agreements were executed. Still, Sheffield did not bring the payments on the notes current. Only sparse token payments were made. Ultimately, the succession was closed and the trusts placed into possession.

### F. The State Court Suit

Suit was filed on the secured notes. Exh. D–4. In this litigation, Sheffield insisted unsuccessfully he had been coerced into signing the reformation agreements which included the additional "lost investment" interest.

In Sheffield's own words:

A. I was coerced into doing it. [Teekell] said that we could go ahead and file suit. I said, well you can go ahead and file suit, but I'm gonna file the usury thing, and that's going to affect the whole thing.

Q. Okay. Well, you admit then that at the time y'all were [re]forming the instruments, because of delinquency, the holder of the note could have declared the note due in its entirety— whatever the legal consequences were?

A. That reformation agreement had nothing to do with my delinquency. It was done in accordance with the agreement that we should do something about that before somebody finds out

about it and reforms it and the estate would lose all the interest.

*Id.* at p. 56, Lines 1–13.

Judgment was rendered for the Plaintiff–Trustee. Before the judgment was signed, Sheffield filed these bankruptcy proceedings. Teekell stated the matter was "kicked back by the bankruptcy judge" to enter a judgment. Another technical amendment to the judgment followed, due to the fact one trust had expired by its terms. Exhs. P–5, P–6.

William M. Ford, a practicing attorney in Alexandria since 1961, testified concerning the state court litigation, in which he represented the plaintiffs. Ford was acquainted with Sheffield as an attorney and a businessman. Sheffield and Ford also knew each other socially. Ford understood that Sheffield was involved in the oil business. Ford did not know, however, the purpose of Sheffield's loans from Mrs. Stone. In preparation for the state court trial, Ford made his own investigation of the public records from which he concluded that Sheffield was Mrs. Stone's attorney.

Ford recalled that Gary Sheffield, Sheffield's son, represented him in the trial. Further, David Sheffield represented his wife Linda Sheffield. Ford also stated that Sheffield's opinion letter regarding the notes, Exh. P–7, was not introduced in the state court trial. Ford explained that he had elicited testimony from Sheffield whereby he admitted that he was Mrs. Stone's attorney at the time the notes were made. Presumably Ford was referring to the testimony quoted *supra* at pages 6–7.

### G. Other Evidence

Mr. Walter Hunter, another Alexandria attorney, practicing for almost 31 years in business, real estate, banking, and bankruptcy matters, testified that real estate was always a large component of his practice. Hunter closed a transaction in 1980 involving a sale from Mrs. Stone to Matthews. Exh. D–11. Although Mr. Hunter did not specifically recollect this transaction, he recalled doing some real estate transactions involving Matthews. He did not remember knowing Mrs. Stone personally.

Hunter stated that during the period of 1979–1980 there was some uncertainty in the

law regarding maximum interest rates and usury. Lenders were attempting to obtain competitive rates. He had some concern as to exactly what rates could be shown in loan documents. Hunter recalled that potential conflicts existed between federal laws, Louisiana statutes, and the jurisprudence, particularly as to private transactions. His research revealed that the Civil Code provided for twelve percent (12%) legal interest, but there were federal peremption and statutes pursuant to La.Rev.Stat.Title 9 that could provide exceptions. Further, commercial loan transactions could exceed "legal" rates. Consumer lenders under Title 9 were generally required to be licensed. Therefore, Exhibit D–11 confirmed to the parties in the Matthews–Stone transaction his precautionary explanation that the interest rate was facially excessive and that all interest might be cancelled. Hunter believed he had more than one such letter signed.

Hunter could not express an opinion as to whether real estate transactions he encountered involved collateral valued less than the loan amount, since he would not have known of the value of the security. The bulk of his practice was creditor oriented. His hourly rate for established clients was $80.00 an hour and $100.00 for others. In most transactions, Hunter considered the borrower to be the client, although he acknowledged obligations to the lender.

### H. The Collateral

Mr. William F. Luke, an abstractor, researched records in Rapides Parish relating to the ranking of mortgages granted by Sheffield to Mrs. Stone. On the property in the Giamanco subdivision, Luke found several encumbrances on the property, including encumbrances to Stone.[2] Exh. P–8.

Regarding the property in Sunset Addition, described as Lot 1 of Square 2, located on Wheelock Street, Luke also found numerous encumbrances. Exh. P–11. The first was an encumbrance to Security Bank filed and recorded in 1974, in the amount of $45,000. This mortgage was reinscribed in 1984. Exh. P–12. Sheffield sold this property to one David Alford Sens on July 1, 1980. Exh. P–13. The recited consideration was $52,000, payable $2,000 in cash and a vendor's lien note for $50,000, bearing interest at 12% from date payable to Sheffield. The sale expressly excluded any warranty relating to "construction, condition and/or redhibitory vices or defect of the … property and improvements." The purchasers acknowledged that the property was "in the present condition of being completely renovated." The Sens note was apparently pledged to Mrs. Stone on September 12, 1980. Exh. P–4. There is no recorded evidence of the pledge by Sheffield to Mrs. Stone.

By an act dated October 8, 1980, and recorded October 9, 1980, Sens conveyed the Sunset Addition property back to Sheffield. The recited consideration for this transaction was:

CONSIDERATION—The consideration for this sale is the cancellation of the mort-

---

2. The descriptions as to this tract are confusing and were the subject of some dispute at the trial. Lot 2 of Block or Square 3 of Giamanco Heights consists of a rectangle fronting 64 feet on Giamanco Street and running back between parallel lines 120 feet. Exh. P–16. Sheffield apparently owned and mortgaged the entirety of this tract to the Rapides Bank in the amount of $25,000, dated October 7, 1968. Exh. P–9. By Act of Partial Release dated October ___, 1975, the bank released its security as to a 20–foot portion. Exh. D–14. This is the same mortgage that was ultimately released in full at Teekell's insistence on his conclusion that its reinspection was untimely.

The 1975 mortgage to Mrs. Stone, as reformed as to the interest rate, affects a 20–foot strip fronting on Giamanco Street and then running back between parallel lines 77 feet. Exh. P–2. The 1980 mortgage to Mrs. Stone grants an encumbrance on 64 feet fronting on Giamanco Street. Exh. P–3. Thus, it would appear that in 1975, Mrs. Stone may have had a first mortgage on the 20-foot strip. Teekell contends she did. The 1980 mortgage to her affected 64 feet fronting on Giamanco Street and running back between parallel lines 77 feet. Exh. P–3. It appears from the Succession of Lucille Duke Sheffield, that Sheffield and his first wife owned other property in the vicinity. This Court is unable to reconcile the descriptions in the Lucille Sheffield succession, Exh. P–30, precisely with the Stone mortgage descriptions.

As of the date of trial in this Court, the Stone mortgages on this property constituted primary encumbrances.

gage indebtedness of $50,000 by mortgage note dated July 1, 1980, Alexandria, Louisiana, executed by David A. Sens and Patricia M. Sens, secured by act of mortgage of David A. Sens and Patricia M. Sens to David A. Sheffield, July 1, 1980 in the amount of $50,000, recorded in Mortgage Book 890, page 380 public records of Rapides Parish, Louisiana.[3]

On the Timberland tract, Luke found three encumbrances. Exh. P–15. The Stone note was first in priority and the reformation agreement second. Mr. Luke made no determination of Sheffield's actual fractional ownership.

## V.

### Valuation of the Collateral

A substantial payment of $76,000 from the mortgage note on the undivided interest in the Timberland tract occurred during the administration of the bankruptcy estate. Two thousand dollars was retained for the purpose of costs and expenses incurred by the Trustee. Teekell opined that only the timber on the tract had significant value, and the land itself was largely swampland. He claimed considerable personal experience in timberland sales. Apparently the co-owner of this tract had commenced cutting unbeknownst to Teekell or the Trustee. Prompt action and the desire to avoid a statutory treble damage claim resulted in recovery. Also, by that date, Teekell observed that the property had a fifteen year growth of timber. He stated without objection that this property had a value of $250 an acre at the time of Mrs. Stone's death.

In support of their contentions that the mortgages on the Giamanco Street and Sunset Acres were originally insufficiently secured, plaintiffs offered the testimony of Phil Sleet, an Alexandria real estate appraiser, broker, and manager. Sleet was licensed in 1970. Sleet was asked to prepare appraisals with an effective date of 1980. Sleet claimed some personal familiarity with the Wheelock

Street area, since he owned property in the vicinity. As of the date of trial, the property was a vacant corner lot close to the railroad tracts on 11th Street. It is located on the I–49 corridor currently under construction through Alexandria. Sleet postulated that the property in 1980 contained a hypothetical or artificial house which was "better than average" for the neighborhood. Based on comparable sales, he arrived at a value of $20,000 in 1980. Exh. P–17. This residence was a one story, pier and beam construction containing six rooms. Three bedrooms, two baths, and an attached garage were included in 1,650 square feet of living area. Some updating was required.

On cross-examination, Sleet was challenged as to the nature of the improvements on the Wheelock property. If the improvements were in fact a large rooming house type structure, then the witness acknowledged that his assumed house estimate was inapposite. He did state that the sale to Sens by Sheffield would need to be reviewed against other comparables. Sleet did not examine the conveyance records for sales in the period. The witness personally owned a rooming house type structure on the river side of the railroad tracts during the period. He noted a trend away from rooming houses by railroad workers, who were beginning to utilize motel facilities. In Sleet's opinion, a $50,000 value in 1980 would assume that the property was in "first class" condition. By that date, the whole area was struggling, and financing was difficult to obtain.

Sleet prepared an appraisal of the Giamanco Street property. Sleet lived in this neighborhood and has passed the property many times. The entire width of this lot is 64 feet. An improvement is presently located on the westerly 20–foot portion fronting on Giamanco Street. While Teekell described this improvement as a "brick wall," it actually appears to be an unfinished portion of a strip shopping center. Exh. P–18A. Sleet asserted it was intended to be an office building,

---

**3.** The reformation agreement relating to this note recites that the Estate of Viola Stone is the holder and owner of "the note" and that Sheffield's original note in the amount of $50,000 was "secured by a mortgage note of David A. Sens."

Apparently, the Sens note was pledged by delivery. If Sheffield had been the holder, the Sens obligation would have been extinguished by confusion. La.Civ.Code art. 1903 (formerly art. 2217, Civil Code of 1870).

and there is some steel for framing but no roof. Rather, the improvements merely consist of a mansard-type front with brick sides and rear walls.

Sleet noted rust on the steel framing. Although plumbing and electricity have been "stubbed in" in the structure, it is not known whether it is in working condition. According to the witness, the structure's commercial use potential is limited by having only two parking spaces. For residential use, it does not qualify "under code." Sleet maintained it would have more value for such a small space if located downtown. The balance of the lot is now unimproved. Sleet concluded that there was little possibility of a purchaser completing the shell. In all likelihood, any purchaser would demolish it and build on the entire lot, which he valued at $11,000. A cost approach would not apply to this incomplete structure. He described the property as "not quite prime." Instead, Sleet characterized the property as "hidden" not "right on MacArthur Drive" or Jackson Street, and found no comparable sales. Sleet stated that although the area once had considerable commercial potential, the neighborhood has reverted to largely residential use. He observed that the general lack of activity in the area supported a conclusion that property values had not really changed since the 1970's.

Sleet could not determine the condition of the Giamanco properties in 1980. If a house was located on the property, with or without the shell, a range of $20,000–$25,000 seemed consistent for residential property in the area if it was in "first class" condition. Between 1975 and 1980, Sleet contended, there may have been a lessening of interest and value of property in the Giamanco area. "Hot spots" moved to the Jackson Street Extension or across MacArthur Drive. In 1980, momentum in areas like Bolton Avenue were "going well," but suddenly they were "dead."

Gary Sheffield is the administrator of Sheffield's estate. He practiced law with his father from 1981 to the latter's death. He testified he was also familiar with Sheffield's real estate holdings. Gary Sheffield noted the proximity of the Giamanco Street property to various other businesses, including a fast-food establishment and restaurants. The 20–foot structure consists of an extension to the "CIT" building located on adjacent Lot 1.

Gary Sheffield described the unfinished shell as a relatively simple structure of triple course brick. There was one beam installed for a ceiling joist, and plumbing and electricity was installed in the concrete slab and walls. The side wall is a party wall with the adjacent "CIT" structure. A roof and front are needed to complete it, together with internal finishing. It was intended for commercial rental space. He noted one proposal to lease the property in his father's file. The remaining portion of the lot was intended to contain a similar structure. Completion did not occur because of financing problems, although the files contain drawings of a completed structure.

Gary Sheffield recalled that in 1975, there was a house on the Giamanco Street property. He described the house as containing three bedrooms and one and 1/2 baths. The house was moved sometime in 1975, by Bob Johnson, a house mover. Prior to that, Gary Sheffield's uncle occupied the house. He estimated the time of completion of the unfinished shell at approximately the same time, and believed the house and the partial structure may have briefly coexisted on the site. He also remembered a possible building code problem, having noted a letter in his father's file concerning a meeting on parking requirements and the need for additional parking spaces.

On the Wheelock Street property, Gary Sheffield remembered that on September 12, 1980, there was a 7,100 square foot, two story building on the property. Formerly a rooming house and office for railroad workers, Sheffield was in the process of converting it to 12–13 single housing units, and repairs were extensive. Sheffield spent "tens of thousands of dollars on it," according to Gary Sheffield. Two rooms or units were combined to make a large one for a manager. Electrical and a majority of the plumbing work was completed. The renovations, however, were not finished, again due to financial difficulties. Ultimately, the building was rented for storage to one, Wilbur Dauzart, a

"land baron." Gary Sheffield recalled doing work on this property with his brothers during summer vacations. He also showed the property to a prospective purchaser while on a school break.

Sheffield's first wife, Gary's mother, died July 7, 1975, after a long illness. After that, Gary Sheffield does not recall going to the Wheelock Street property often, but does remember passing in route to the European Hotel, another family holding. The hotel was unoccupied. At some point, he believed one of his brother's advised him that this property burned, but does not recall the date or if it was insured.

## VI.

### Analysis

#### A. Was There an Attorney–Client Relationship Between Sheffield and Mrs. Stone?

■ These reasons first address the plaintiffs' contentions that a defalcation arose while Sheffield acted as a fiduciary to Mrs. Stone, thus violating 11 U.S.C. § 523(a)(4). Under the law, the inquiry is twofold. At the outset, it must be determined that a fiduciary relationship exists under state law. In Louisiana, the relationship between an attorney and a client is that of a fiduciary. *Soderquist v. Kramer*, 595 So.2d 825 (La.App.2d Cir. 1992); *Plaquemines Parish Comm'n Council v. Delta Dev. Co.*, 502 So.2d 1034 (La.1987).

■ The next prong of the analysis arises under federal law. In the case of *In re Moreno*, 892 F.2d 417, 421 (5th Cir.1990), the Fifth Circuit observed that "[a] defalcation is a willful neglect of duty, even if not accompanied by fraud or embezzlement." A defalcation may consist of something less than an intentional act and may encompass negligent or ignorant conduct. *Summers, The Exception to Discharge in Bankruptcy for Defalcation by a Fiduciary*, 92 Commercial Law Journal, No. 3, (1987). *See also Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937); *In re Chris J. Roy, Law Corp.*, 130 B.R. 214 (Bkrtcy.W.D.La. 1991), *aff'd sum nom Roy v. Gravel*, 143 B.R.

825 (W.D.La.1992); *aff'd without op., In re Roy*, 983 F.2d 1062 (5th Cir.1992), *cert. denied, Roy v. Gravel*, —— U.S. ——, 113 S.Ct. 2931, 124 L.Ed.2d 681 (1993).

Undoubtedly, Mrs. Stone's business affairs were quite extensive. The *Cloud* litigation, her husband's death, her daughter's divorce and mental illness, and her son's untimely death were additional complications. From the 1950's to the date of her death, she came into contact with many members of the local bar, including both Sheffield and Teekell.

Specific rules govern the relationship between attorneys and their clients. In Louisiana, the Rules of Professional Conduct govern this situation. Rule 1.8 provides that a lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, or other pecuniary interest adverse to the client, unless the terms of the transaction are disclosed to the client in writing in a manner that can be reasonably understood, the client is given a reasonable opportunity to seek the advice of independent counsel, and the client consents.[4] Defendant cites, *inter alia*, two Louisiana cases which they assert support their contention that Sheffield's relationship with Mrs. Stone at the time of the loans was that of business persons, and not attorney-client. These cases are *Delta Equipment and Constr. v. Royal Indem. Co.*, 186 So.2d 454 (La.App. 1st Cir., 1966) and *Agregaard v. Skrmetta*, 131 So.2d 363 (La.App. 4th Cir., 1961).

In *Delta*, two lawsuits were filed in Natchitoches Parish, Louisiana, against Delta by one L.T. Lewis. One suit concerned worker's compensation benefits and the other was for wages. Service was made on Delta through an employee. Instructions were obtained by this employee to mail the papers to Delta's insurance, but the employee did not realize there were in fact two suits. The insurance agency forwarded the documents to Royal, the workers' compensation carrier which, in turn, forwarded the same to a Shreveport law firm. When the attorney received the documents, he discovered the

---

**4.** The parties concede that the Model Rules of Professional Responsibility and the former Canons of Ethics apply the same requirements in this context.

second wage suit, mailed it back to Royal, and filed pleadings in and defended only the workers' compensation suit. Royal returned the wage suit to the insurance agency, which, in turn sent it to Delta. Delta received the wage suit and a notice of default judgment on the same day. Suit was filed for failure to defend, and summary judgment was rendered for the insurer and the law firm. The decision was affirmed based on the lack of a factual basis for a determination that Delta relied on the law firm to defend the wage claim. Moreover, the court observed that the relationship of attorney and client is contractual and arises from mutual consent, or the clear and express agreement and understanding of the parties as to the services to be performed and the compensation to be paid. *Delta*, 186 So.2d at 458.

*Agregaard* bears a closer resemblance to this case. In that case, Skrmetta sold property to Agregaard on May 2, 1950, and there was a lease by the vendee to the vendor on the same date. Thereafter, a lawsuit was filed for possession due to nonpayment of the rent. Skrmetta claimed that he was a man of limited education and that Agregaard was his attorney. He contended that he consulted with Agregaard prior to the sale about other offers he had received on the property. Agregaard discouraged the sale and offered to lend Skrmetta the money on an unsecured basis. Later, Agregaard informed Skrmetta that security, in the form of a second mortgage, was needed. A sale and lease-back arrangement resulted. Ultimately, after a jury trial, Skrmetta prevailed on the consolidated rental claims and his prayer for a judgment requiring Agregaard to transfer the property back to him. Agregaard subsequently appealed.

Skrmetta maintained that his relationship with Agregaard was that of attorney-client at the time of the sale. The Fourth Circuit noted that the parties had been childhood friends. After going their separate ways, the two men became reacquainted and engaged in various business dealings. Despite Skrmetta's limited business experience, he had many business interests besides those involving Agregaard, who handled only three or four isolated legal transactions of no great consequence. There was never a retainer. Thus, the Appellate Court reversed and concluded that there was always a business relationship, but never an attorney-client relationship between the parties.

Other cases, not cited by the parties, are illustrative. In *Louisiana State Bar Ass'n v. Nader*, 472 So.2d 11 (La.1985), the Louisiana Supreme Court examined a number of loan transactions between an attorney and various clients. The attorney acknowledged that his problems "arose in large measure out of his lack of sufficient income." 472 So.2d at 12. The commissioner, appointed by the Supreme Court, found that there was no reasonable possibility of repayment at the time the loans were made. In interpreting the regulation prohibiting business transactions with clients, the Supreme Court turned to *In re Conduct of Montgomery*, 292 Or. 796, 643 P.2d 338 (Or.1982). In *Montgomery*, the Oregon Supreme Court concluded that: (1) a loan is a business transaction; (2) the lawyer and client had different interests, *i.e.*, lender and borrower; and (3) the client expected the attorney to exercise professional judgment, not as to credit worthiness, but as to whether the loan was valid and legally enforceable and that the documents were in proper form and evidence a legally enforceable obligation. The fourth element, the client's consent, can permit the transaction to proceed even if the first three elements are present.

In this matter, Mrs. Stone first consulted Sheffield in the 1950's. By the late 1960's, he closed numerous loans for her and issued title opinions. In 1977, he handled a donation matter in her daughter's Interdiction and prepared notes for a revision to her will. It is true that she also relied on Teekell for legal advice, particularly in estate matters, but Teekell did not encourage Mrs. Stone to use his services in real estate transactions. Sheffield did. Later, Sheffield handled Mrs. Stone's son's estate when he died, only one year prior to her own death. He was also involved in her medical bill dispute prior to her death, the successful resolution of which became known just afterwards.

■ This Court concludes that defendant's reliance on *Delta* and *Agregaard* is mis-

placed. Sheffield and Mrs. Stone's contacts were far more frequent, and Mrs. Stone relied on Sheffield as an attorney by debtor's own admission. There is no showing that Sheffield discouraged Mrs. Stone from entering into the transactions, as did Agregaard to Skrmetta. This Court finds that plaintiffs established an attorney-client relationship between Mrs. Stone and Sheffield. The absence of a retainer does not change this result.

By all accounts, Mrs. Stone was engaged in the business of a lender.[5] Teekell testified that Mrs. Stone was rigorous in requiring adequate security for the loans. The conclusion that Mrs. Stone entered into several business transactions with Sheffield after the attorney-client relationship was established is inescapable. She entrusted Sheffield with the preparation of the loan documents relating to loans to him and others, and expected these documents to be legally enforceable.

At the time, the law on usury in this area was unsettled. Teekell recalled expressing some concern to her about the interest rates. Sheffield assured Mrs. Stone that the notes were enforceable. There is no showing that Sheffield explained the risk of loss of interest to her. The relationship of lender-borrower is inherently adverse. That situation does not change when the borrower is the lender's attorney. Thus, the first three elements of the applicable regulations, are met. However, the client's consent can permit the transaction to proceed. In this matter, there is no evidence that Mrs. Stone consented or that she was advised to seek independent counsel.

### B. Was There Yet Another Attorney–Client Relationship?

■ Even if Sheffield had *never* been Mrs. Stone's personal attorney prior to her death, the first prong of § 523(a)(4) would be satisfied once he agreed to serve as attorney for the executor in the succession. By doing so, Sheffield became inextricably involved in a conflict quagmire. He was the estate's debtor, and ceased to pay. He then claimed the notes were usurious in a futile attempt to reduce his liability. Ultimately, Sheffield claimed prescription on the notes. His ever-changing positions were totally untenable.

Undaunted, Sheffield issued an opinion to the succession representative that efforts to collect notes bearing usurious interest rates would result in the loss of all interest, despite his own personal liability on several such notes. There is no showing that the succession representative expressly waived any conflict, or was advised to obtain other counsel. Sheffield's own opinion letter, Exhibit P–7, by any standard of the duty owed by an attorney to a client, is damning by its mere issuance. If ever there was a need to caution a client of a conflict, this was it. It was imperative that Sheffield obtain the client's waiver, but he failed to do so.

■ Regarding the second prong of § 523(a)(4), Sheffield's own testimony acknowledged his ethical dilemma. Rather than withdrawing from further representation, or obtaining the client's consent, it is clear that he threatened (according to both his and Teekell's testimony) to blow the whistle on the usurious transactions. This extortion threat is insurmountable evidence of his willful neglect of duty. *See, supra, In re Moreno.*

### C. Was There Fraud Under § 523(a)(2)?

■ A review of this sordid affair establishes that Sheffield was in severe financial difficulty although he continued to repay Mrs. Stone until her death. Gary Sheffield recalled that his father's credit line at Rapides Bank terminated in 1978. There were also problems with a waste oil brokering business in the Baton Rouge area. Gary Sheffield remembered that the 1980 loan proceeds were used in an effort to salvage this business. In essence, a majority of the business contracts were to clean barges on the Mississippi River used to transport oil. Sediment from these cleaning operations had to be removed according to certain requirements. The business was originally doing "fairly well," but supervising agencies pro-

---

**5.** Whether Sheffield borrowed the money for business or personal purposes is irrelevant in this analysis.

mulgated new requirements to "bring it up to specifications." Although the necessary modifications were made, after the problem "went on for ever," the plant ceased to operate while Gary was in law school.

According to Gary Sheffield, the decision to close the plant was based on the political climate in the area of the facility, even though the debtor had complied with the EPA requirements (or was excluded by a "grandfather" clause). Gary Sheffield stated that the population in the area, near Walker, Louisiana, grew in the direction of the facility. Reopening it was not a popular idea.

Sheffield's own testimony sheds a different light on this situation. He testified that he borrowed $450,000 from the Rapides Bank to clean up the plant. Exh. D–(4)(b), p. 49, Line 12. When Rapides Bank terminated his credit line, he needed an additional $100,000. *Id.* at p. 47, Lines 6–7.

Gary Sheffield testified that the partially constructed office and the former residence co-existed on the Giamanco Street tract as late as 1975. Construction on the office ceased due to financing problems, and there may have been a building code violation as well. In that same year, the first Mrs. Sheffield died, leaving large medical bills. Sheffield incurred $30,000 to $40,000 in medical expenses at the time of his wife's death. Part of the proceeds of the 1975 loan was used to pay same. *Id.* at 63–64. In addition, Sheffield's children were in college and he needed money. *Id.* at p. 50, Line 14. He helped his children with loans and other matters. *Id.* at p. 51, Lines 11–13. Questions by Gary Sheffield of Teekell at the trial in state court refer to a "buyout" of his children in his first wife's estate. Exh. D–4(a), p. 69, Lines 18–19.

According to Sleet, between 1975, when the first loan on the Giamanco Street property (Exh. P–2) was made, and 1980 when the second was closed, the area's potential was "dead," at least commercially. A portion of this property was subject to a mortgage in favor of Rapides Bank, in the face amount of $25,000, dated October 7, 1968. Exh. P–9. This was a collateral mortgage which could be used to secure future advances. Although no evidence was offered as to the balance on this mortgage in 1975 or 1980, Sheffield's credit line with Rapides Bank was closed in 1978. In short, whether Mrs. Stone's mortgage was first or second on all or part of this tract is irrelevant. After 1975, this property was essentially worthless as collateral.

On the Wheelock/Sunset Acres property, there is absolutely no evidence that Mrs. Stone was ever advised that Sheffield, less than thirty days after borrowing from her, accepted a dation en paiement from Sens on the property. At the time of Sens purchase, the property was undergoing renovation. Sheffield carefully excluded facts relating to the renovation in selling to Sens. Moreover, he did nothing to protect his own client when he borrowed from her. Whether this property contained a boarding house or a single family residence is also irrelevant. By 1980, this area was "struggling." Sleet opined that the Sens sale amount would not have been realized as a market value unless the property was in "first class" condition. This likelihood is disputed by Sheffield's own sale to Sens. Its only use, after the so-called renovation, was for storage. By the time Gary Sheffield joined his father's law practice in 1981, this property had burned.

Less than thirty days after obtaining a loan from Mrs. Stone using the Sens note as collateral, Sheffield accepted a dation en paiement from his own vendee. Thus, his own client was left unsecured on the public records for almost six years. This fact alone is sufficient to establish fraud.

The 1986 reformation agreements extended or refinanced the original notes and security devices. Sheffield's economic situation had not improved in the interval. The Giamanco Street property remained incomplete. Its only useable structure, the house, was gone. The area had also lost its commercial potential. The Wheelock Street property was a vacant lot. The Timberland tract was producing no income. Several more years would lapse before there was recovery from the timber sale. This was well into the Trustee's administration.

In *Nader, supra,* the Louisiana Supreme Court noted the loans to the attorney were a result of his less than realistic expectation of

repayment. In *Louisiana State Bar Ass'n v. Reis,* 513 So.2d 1173 (La.1987), the respondent-attorney maintained that the client was dissatisfied with the interest rate the borrower-client would have earned on conventional investments such as certificates of deposits. The attorney further argued that the assets encumbered in the client's favor exceeded the face value of the loan, and that his financial statement never fell below $500,000. But, the *Reis* court noted there was no evidence to support the attorney's contention. In *Louisiana State Bar Ass'n v. Bosworth,* 481 So.2d 567 (La.1986), the Louisiana Supreme Court examined a loan transaction where the attorney did not disclose his true financial situation to the client. The Court concluded full disclosure was not made. If the full financial disclosure had been made, the loan would not have occurred.

Here, Sheffield did not disclose his financial plight to Mrs. Stone or Teekell. Unable to obtain credit after 1978, he continued to pay until her death. Thereafter, he stalled, all the while masquerading as the lawyer-devil's advocate. He blithely asserted that the loan transactions were usurious. Later, after filing a petition for reformation, he concocted yet another basis for delay, maintaining in state court that the reformed obligations themselves were usurious or obtained by duress. He threatened to disclose the usury defense to the detriment of the estate he was handling. All the while, Sheffield was fully aware that he could not pay and that his collateral was useless. In summary, by 1986, Sheffield's schoolboy-architect inspired collection of castles was demonstratively composed of sand.

### D. Was There a Violation of § 523(a)(6)?

■ Conduct falling short of the requirements of 11 U.S.C. § 523(a)(4) has sometimes been found to violate § 523(a)(6) as a willful and malicious injury. *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.,* 783 F.2d 480 (5th Cir.1986). "Willful" means intentional and "malicious" means without just cause or excuse. *Id.* at 486. The evidence in this matter distills to the conclusion that once Sheffield's empire began to collapse like a house of cards and was unable to obtain credit, he turned to his own client, friend, and neighbor, Mrs. Stone, for funds. Ultimately, he borrowed almost one-half of her estate without any reasonable prospect of repayment and without adequate collateral. Later, after her death, Sheffield compounded his already egregious conduct by refinancing and extending the already suspect debt with the very estate he was charged with representing. In his own words, Sheffield knew and understood that Mrs. Stone's funds that she loaned to him were her property and that she was in the business of lending. Later, the assets of the estate were subject to the claims of the heirs.

In *Chrysler Credit,* the Fifth Circuit engaged in an extensive analysis of the Louisiana delictual action. In that case, a corporate officer diverted corporate funds to his own personal use, taking them to Las Vegas. Thus, the Court held a tortious conversion occurred. The Court also observed that Louisiana recognized a somewhat different cause of action distinct from common law conversion. This can be a wrongful act of repudiation of the owner's right to property or some exercise of dominion over it inconsistent with the rights of the owner.

In this matter, Sheffield released the Sens mortgage note on the face of the public records. Since Sheffield had previously pledged this note to Mrs. Stone, his actions constituted dominion and control over her property inconsistent with her rights. It is inconceivable that less than thirty days after making a loan, she intended to be left unsecured. In Sheffield's capacity as attorney for the estate representative, he consciously acted in utter disregard of his ethical duties to the estate and the ultimate heirs, an Interdict and a grandchild, whose father's estate Sheffield also handled. Similar to the situation in *Chris Roy, supra,* debtor espoused ethical considerations. These were intended to obfuscate his desire to extricate himself from an unsatisfactory arrangement of his own making. The fact Sheffield acted willfully and maliciously in violation of his clients' interests is beyond serious debate.

### VII.

### What is the effect of the Reformation Agreements?

■ These reasons now turn to whether the reformation agreements bar plaintiff's

recovery. In Louisiana, a transaction or compromise is an agreement between two or more persons to adjust their differences by mutual consent. La.Civ.Code art. 3071. However, it regulates *only* the differences which are clearly comprehended in them by the intention of the parties. La.Civ.Code art. 3073. It does not extend to differences which the parties did not intend to include. The pleadings in the Succession, Exh. D–3, and the transcript of the trial in state court, clearly reflect that the difference intended to be adjusted was the interest issue alone. Consequently, this defense is without merit.

## CONCLUSION

Pursuant to these reasons, there will be judgment in favor of the plaintiffs decreeing all amounts due under the Judgment as amended in the matter styled James Carson Stone, Jr., Trust, et al. vs. David A. Sheffield, et al. No. 164,262, in the 9th Judicial District Court for Rapides Parish, Louisiana, nondischargeable against the Estate of David Sheffield. A separate and conforming order will be entered.