In re Carl D. WASHINGTON and
Diane I. Washington, Debtors.

TRAVELERS EXPRESS
COMPANY, Plaintiff,

v.

Carl D. WASHINGTON and Stanley E.
Silva (Chapter 7 Trustee), Defendants.

Bankruptcy No. 287–04541–B–7.
Adv. No. 287–0483.

United States Bankruptcy Court,
E.D. California.

Oct. 5, 1989.

Vincent O'Gara, San Francisco, Cal., for plaintiff Travelers Exp. Co.

Anthony I. Furr, Sacramento, Cal., for debtor Carl D. Washington.

## MEMORANDUM OF DECISION

DAVID E. RUSSELL, Bankruptcy Judge.

### FINDINGS OF FACT

Prior to the filing of his voluntary Chapter 7 petition in bankruptcy on August 10, 1987, Carl Washington (hereinafter "WASHINGTON") was a partner with Mr. Milton Craig (hereinafter "Craig") of Insta

Check Cashing Co. (hereinafter "INSTA CHECK") which, in addition to cashing checks and selling identification cards, issued money orders on behalf of Central Bank and, later, Traveler's Express Co. (hereinafter "TRAVELERS").

Although the commissions earned by INSTA CHECK from the sale of money orders constituted only a small percentage of the face value of those money orders, the gross proceeds were quite substantial. The tremendous potential earning power of those cashier check dollars could not, however, be harnessed in the regular course of business due to Central Bank's prudent policy[1] of requiring that all proceeds from the sale of cashier checks drawn on its account be promptly remitted into a special trust account created for that purpose by noon the following day. Consequently, INSTA CHECK was obliged to pursue the less lucrative avenue of conventional financing to capitalize its daily check cashing operations.

On or around January 8, 1987, WASHINGTON and Craig were approached by two of TRAVELERS' local representatives, one of whom was Don Waybright (hereinafter "Waybright"). In an effort to induce INSTA CHECK to switch to TRAVELERS cashier's checks, Waybright made representations to INSTA CHECK to the effect that the latter would be required to remit money order proceeds twice a week, rather than by the close of business of the day on which said proceeds were collected and, further that TRAVELERS would allow INSTA CHECK to remit the proceeds to the latter by mail rather than enforcing TRAVELERS' policy that all funds be deposited directly into a previously established trust account controlled by TRAVELERS.[2]

The obvious implication (whether expressed or merely implied by Waybright) of the above-referenced representations was that INSTA CHECK would have access to the money order proceeds to fund its regular check cashing business, the proceeds of which, in turn, would be used to restore the balance owed to TRAVELERS. In fact, during the six month period INSTA CHECK sold TRAVELERS' money orders, no segregated account for the benefit of TRAVELERS was ever established. It was freely admitted that the gross money order proceeds were utilized without reservation to fuel the check cashing operations of INSTA CHECK. Furthermore, Larry Baldwin, the Regional Control Manager for TRAVELERS, admitted on cross examination that the Regional Office had no procedures in effect to assure that agents actually used a trust account and that he didn't know whether INSTA CHECK was using one or not. He also acknowledged that without a trust account, TRAVELERS funds were at risk of loss to third party claimants until INSTA CHECK's remittances cleared INSTA CHECK's bank.

Ultimately, INSTA CHECK's encountered a liquidity problem and the business

1.  As will be discussed in greater detail below, the California Financial Code devotes an entire division to what is commonly referred to as the "Check Sellers and Cashers Law" which tenaciously regulates check cashing or check selling businesses. Central Bank's modus operandi generally reflects the guidelines set forth in the provisions of those statutes.

2.  Both of these representations were in direct conflict with the terms of the written "Trust Agreement" executed by and between TRAVELERS and Insta Check on January 8, 1987:

    "3.  Sales, Remittances, Reports. Agent [INSTA CHECK] shall issue and sell money orders delivered by the Company [TRAVELERS]; shall collect in cash for each money order issued the face amount plus such fee as the Company shall establish from time to time in writing; and shall remit the funds, less Agent's commission, to the Company. *Agent shall remit such funds at the close of the day on which collected,* unless otherwise instructed in writing, and shall forward with remittances such reports as may be required by the Company. *Agent shall remit by a receipted copy of a bank deposit slip covering cash funds or the equivalent deposited directly by Agent to the Company's bank account, by cashier's check or other form of remittance."*

    Waybright did testify that he reached a "gentleman's agreement" with INSTA CHECK to eventually open up a trust account. Nevertheless, he admitted that despite frequent visits to INSTA CHECK after the business relationship was consummated, he never attempted to verify whether a special account had in fact been established.

failed.[3] When the proverbial smoke cleared INSTA CHECK found itself unable to satisfy TRAVELERS' demand of $24,-342.79.[4] WASHINGTON subsequently filed a Chapter 7 petition in bankruptcy on August 10, 1987. TRAVELERS responded by filing the above-entitled adversary complaint seeking a constructive trust against WASHINGTON's assets, an accounting, and a judgment declaring the debt owed to it by INSTA CHECK and personally guaranteed by WASHINGTON and his partner, Craig, nondischargeable pursuant to 11 U.S.C. §§ 523(a)(4) (Fraud or defalcation while acting in a fiduciary capacity) and 523(a)(6) (willful and malicious injury to the property of another).

## DISCUSSION

i. *11 U.S.C. § 523(a)(4) [First Cause of Action]*

11 U.S.C. § 523(a)(4) provides as follows:

**§ 523. Exceptions to Discharge.**

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt-

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

WASHINGTON argues that no "fiduciary" relationship between INSTA CHECK and TRAVELERS was ever contemplated or, as a matter of law, established for the purposes of 11 U.S.C. § 523(a)(4).

■ The issue of whether a "fiduciary" relationship exists for the purposes of 11 U.S.C. § 523(a)(4) must be determined by reference to federal law. (*Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986),

citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *In re Pedrazzini*, 644 F.2d 756, 758 (9th Cir.1981)). Federal law narrows the general definition of fiduciary ["a relationship involving confidence, trust and good faith" (See *In re Angelle*, 610 F.2d 1335, 1338–39 (5th Cir.1980)] by requiring that "the trust giving rise to a fiduciary relationship be imposed prior to any wrongdoing; [that is] the debtor must have been a 'trustee' before the wrong and without reference to it." (*Haller*, supra, 780 F.2d at 796, citing *Davis*, 293 U.S. at 333, 55 S.Ct. at 153; *Pedrazzini*, 644 F.2d at 758; *In re Short*, 818 F.2d 693, 695 (9th Cir. 1987); *In re Thornton*, 544 F.2d 1005, 1007 (9th Cir.1976)). Thus, constructive or implied trusts will be excluded from the jurisdiction of 11 U.S.C. § 523(a)(4) while express statutory trusts will not. (*In re Short*, supra, 818 F.2d at 695).

■ Notwithstanding federal law, whether or not a "trust" exists so as to give rise to a "fiduciary" classification must be established by reference to state law. (*In re Short*, supra, 818 F.2d at 695, citing *Haller*, supra at 795–96). To be valid, an "express trust" must establish a trustee, a trust "res", a beneficiary, a legal purpose, and a legal term. (*In re Johnston's Estate*, 47 Cal.2d 265, 303 P.2d 1 (1956)). Further, there must be some manifestation of an intent to create a trust. (76 Am.Jur.2d, Trusts, at § 31). TRAVELERS argues that the document entitled "Trust Agreement" executed by and between INSTA CHECK and TRAVELERS on January 8, 1987 (supra) established a

| | |
|---|---|
| $24,113.39 | (Returned "NSF" Check) |
| $ 5,262.42 | (  "      "   "   ) |
| $ 150.00 | (Audit Charge) |
| $ 45.00 | (Open Memo) |
| $34,442.79 | (Sub–Total) |
| <$10,100.00> | (Payment*) |
| $24,342.79 | (Total Outstanding Balance Due) |

\* The above-referenced $10,100.00 "payment" included a $5,247.00 check payment and a $4,663.00 cash withdrawal from INSTA CHECK's register by TRAVELERS on July 15, 1987.

---

**3.** Craig testified that INSTA CHECK became insolvent on or around July 8, 1987 due to a "charge back" by the Bank of America to INSTA CHECK's account in the amount of $98,000.00 for a bad check cashed by the latter. Catching wind of the disaster, several of INSTA CHECK's creditors, including TRAVELERS rushed in and grabbed up substantially all of INSTA CHECK's' liquid assets thereby forcing closure of the business as a going concern.

**4.** The $24,342.79 is broken down by TRAVELERS as follows:

| | |
|---|---|
| $ 4,413.37 | (Report in Transit) |
| $ 458.61 | (Audit Report) |

valid express trust. This court disagrees. The mere use of the term "trust" does not necessarily manifest an intent to create a trust relationship. (*Petherbridge v. Prudential Savings & Loan Ass.*, 79 Cal. App.3d 509, 516, 145 Cal.Rptr. 87 (1978)). The unusual but express representations made by TRAVELERS' agents to INSTA CHECK at the time the relationship was consummated, coupled with the cavalier attitude of TRAVELERS' management of assuring compliance with the Trust Agreement, can only lead to the conclusion that no trust relationship was ever contemplated by the contracting parties.

■ TRAVELERS argues, however, that regardless of whether or not the Trust Agreement was effective in creating a trust, California has enacted a comprehensive scheme devoted to regulating "check sellers or cashers"[5] commonly referred to as the "Check Sellers and Cashers Law" (hereinafter "CS & C Law"), which controls the relationship of the parties. (Division 3, Cal.Fin.Code §§ 12000–12403). Section 12300.3 specifically regulates the check seller's control over proceeds from, inter alia, the sale of money orders and provides in pertinent part as follows:

> All funds received by a licensee or its agents from the sale of ... money orders ... shall constitute trust funds owned by and belonging to the person from whom they were received or a licensee who has paid the ... money orders ... for which the funds of such persons have been received by the agent but not transmitted to such licensee or deposited in the trust account of such licensee.

Without reading further, the statute manifests the intention, at the very least, of transmogrifying ordinary proceeds *at the time they are received* by the check seller into "trust funds", thereby satisfying the elements[6] of an express trust. The natural implication of such a characterization would render the check seller the "trustee" and the licensee/principal the "benefi-

ciary". Unfortunately, the legislature muddies the waters with its demonstrated propensity for verbosity. The statute continues as follows:

> If a licensee or an agent of a licensee shall commingle such funds with those of his own, all assets of such agent shall be impressed with a trust in favor of said purchaser or the licensee in an amount equal to the aggregate funds received or which should have been received by the agent from such sale. Such trust shall continue until an amount equal to said funds is separated from those of the agent and transmitted to the licensee or deposited in the trust account of licensee ... (Added by Stats.1963, c. 1817, p. 3745, § 6. Amended by Stats.1976, c. 1320, p. 5907, § 4.1 (emphasis added)).

In contrast to the opening phrase of the statute, the clause set forth above bears the markings of a "trust ex maleficio" or one arising solely as the result of wrongdoing (commingling) and therefore not included within the purview of § 523(a)(4). When read in conjunction with the entire section, on the other hand, the above-referenced clause renders itself superfluous as it essentially purports to create a constructive trust over trust funds.

Notwithstanding the anomalous language in the CS & C Law, however, the California Supreme Court has determined the effect of Cal.Fin.Code § 12300.3 upon the rights of third party creditors against the "trust funds" to be as follows:

> "In terms of trust law, when a check is sold the licensee becomes the trustee, the purchaser becomes the trustor, and the third party payee and holders in due course become the beneficiaries of the trust. The Legislature, by section 12300.3, has authorized both trustor and beneficiaries to enforce the trust, but has denied to general creditors such as plaintiff the right to attach or levy upon the trust funds ..." (*Bank of America v.*

---

**5.** "Check Casher and Seller" is defined at Cal. Fin.Code § 12002. There is no dispute over whether INSTA CHECK or its principals qualify under this Division.

**6.** See note 7, infra.

*Bowden,* 46 Cal.2d 863, 868, 300 P.2d 10 (1956) (emphasis added)).

Although it appears that the elements of both a constructive and express trust are satisfied by the referenced language in § 12300.3 this court joins in the Supreme Court's recognition that, at the very least, the purpose of the CS & C Law was to create an express trust between the check seller, the purchaser, and the licensee.[7] Consequently, under the circumstances, at the moment money orders are sold an express trust is created wherein the cash proceeds constitute the "res", the money order seller *and its principals*[8] become the "trustees" over that res, and the purchasers or the money order provider as the principal licensee become the beneficiaries (depending on who is left holding the proverbial "bag") entitled to the trust funds. Under this scenario, WASHINGTON would clearly be "acting in a fiduciary capacity" for the purposes of 11 U.S.C. § 523(a)(4) and, because "defalcation" includes the innocent default of a fiduciary who fails to account fully for money received (*In re Short,* supra, at 694, citing *In re Barwick,* 24 B.R. 703, 706 (Bankr.E.D.Va.1982); *In re Levitt,* 18 B.R. 598, 602 (Bankr.E.D.Pa. 1982)), WASHINGTON's obligation to TRAVELERS would be nondischargeable.

But the facts of this case reveal a pattern of conduct that is neither normal nor one contemplated by the Legislature. Rather than implement the normal procedures utilized by its predecessor (Central Bank) to assure compliance with the CS & C Law, TRAVELERS chose instead to offer INSTA CHECK a "deal too good to refuse" (especially to such a small agent such as INSTA CHECK) and which, as TRAVELERS knew, or should have known, needlessly exposed the proceeds from the sale of their money orders to the risk of loss. Perhaps TRAVELERS had good business reasons for its conduct and/or believed that in the event of trouble, such as occurred in its dealings with INSTA CHECK herein, the CS & C Law would shift the burden of loss to its agents and away from itself.

Be that as it may, this court cannot condone such conduct, particularly where, as here, normal procedures might have prevented any loss at all and, at the very least, saved an honest debtor[9] the prospect of a substantial non-dischargeable obligation surviving his bankruptcy. Consequently, this court finds that the representations made to INSTA CHECK by Mr. Waybright manifest a knowing, voluntary, relinquishment of TRAVELER's statutory[10] and con-

---

**7.** As was outlined above, the requirements of a valid, express trust include a trustee, trust property, a beneficiary, a manifestation of intent to create a trust, a legal purpose, and a legal term. In the context of Cal.Fin.Code § 12300.3, the trustee would clearly be the check seller (INSTA CHECK), the res would be the proceeds from the principal licensee's (TRAVELERS') money orders, the beneficiary would be either the principal licensee or the money order purchaser. The purpose of the Check Cashers Law—
"... to safeguard from the general creditors of the licensed check seller issuing a check or money order in the usual course of such business the funds paid in to the licensee by purchasers of [those] checks ..." (*Bank of America v. Bowden,* 46 Cal.2d 863, 864, 300 P.2d 10 (1956))—is not only "lawful" but, in addition, manifests a clear intent to create a fiduciary relationship which will inure exclusively to the benefit of named trust beneficiaries.

**8.** WASHINGTON may not escape liability by hiding behind the skirt of the partnership. The California "Uniform Partnership Act" (California Corporation's Code §§ 15001 et seq.) provides that "[p]artners are liable jointly and severally for everything chargeable to the partner-

ship under [inter alia] § 15014." (Ca.Corp.Code § 15015). Section 15014(b) provides, in turn, that:
The Partnership is bound to make good the loss:
(b) [w]here the Partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the Partnership. (Added by Stats.1949, c. 383, p. 678, § 1).

**9.** There is no evidence that WASHINGTON did anything but comply with the procedures agreed upon between INSTA CHECK and TRAVELERS. The court notes that although the checks sent by INSTA CHECK to TRAVELERS during the course of their six month relationship were obviously drawn from that business' general operating account, TRAVELERS cashed the checks without objection.

**10.** The court is not aware of any law or policy which under these circumstances would prevent a named beneficiary under a statutory law from waiving any and all benefits that such a statute might otherwise confer upon it.

tractual benefits. Under the circumstances, therefore, TRAVELERS' must be estopped [11] from claiming either the statutory benefits made available pursuant to the CS & C Law or any benefits stipulated to in the Trust Agreement.[12]

ii. *11 U.S.C. § 523(a)(6) [Second Cause of Action]*

■ 11 U.S.C. § 523(a)(6) renders a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" nondischargeable. Although the standard of proof has not been conclusively established in this district (See discussion in *Rubin v. West* (In re Rubin) 875 F.2d 755 (9th Cir.1989), at nt. 2), TRAVELERS has failed to convince this court by even the lower standard of the "preponderance of evidence" that INSTA CHECK or its principals acted in bad faith, dishonestly or otherwise with malice while handling TRAVELERS' money order proceeds. Rather, WASHINGTON · simply conducted himself and the business in a manner consistent with a pre-arranged agreement with TRAVELERS.

The court must reject the contention that the pre-eminent 9th Circuit Court of Appeal holding in the case of *Impulsora Del Territorio Sur v. Cecchini* (In re Cecchini), 780 F.2d 1440 (9th Cir.1986) intended to or did in fact eliminate the requirement of a finding of malice under the circumstances heretofore delineated in connection with INSTA CHECK/TRAVELERS transaction. The widely acclaimed holding in *Cecchini* reads as follows:

> When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is "willful and malicious" even absent proof of specific intent to injure. (*In re Cecchini*, 780 F.2d 1440, 1443).

Clearly the *Cecchini* court's holding is limited in effect to any "wrongful act such as conversion" which "necessarily produces harm and is without just cause or excuse".[13]

---

**11.** Estoppel is an equitable remedy arising from an act, admission, or conduct which has induced a change of position in accordance with the real or apparent intention of the party against whom the estoppel is asserted. (30 Cal. Jur.3d (Rev.), Estoppel & Waiver, at § 1, p. 1 (citations omitted); 28 Am.Jur.2d, Estoppel & Waiver, generally).

**12.** The court finds estoppel to be particularly appropriate under these circumstances wherein TRAVELERS, by and through its representatives, intentionally represented to WASHINGTON that TRAVELERS would essentially waive its right to enforce the contractual and statutory requirements of creating a trust account into which money order proceeds would be deposited in order to induce WASHINGTON to sell TRAVELERS money orders. WASHINGTON clearly (and under the circumstances, reasonably) relied upon the above representations to his detriment by closing out INSTA CHECK's account with Central Bank, signing up with TRAVELERS, and complying with the TRAVELERS authorized modus operandi for the duration of their relationship (approximately six months).

**13.** This court respectfully questions whether the Ninth Circuit was acting within its jurisdiction when it ratified the novel "implied malice" exception to the plain language of § 523(a)(6). Clearly, statutory construction of bankruptcy laws must begin with the language of the statute itself (*United States v. Ron Pair Enterprises, Inc.,*

—— U.S. ——, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)), and a court should not construe a statute to abrogate the common law, or to establish a new rule of law absent clear evidence in favor of such construction. (*In re Mark Anthony Construction, Inc.,* 886 F.2d 1101, 1107; (9th Cir.1989)). This court notes that § 523(a)(6) unambiguously requires a finding of "willful and malicious injury" before a debt may be determined nondischargeable within that section. Further, this court notes that the controlling common law surrounding § 17(a)(2) of the Bankruptcy Act (predecessor to § 523(a)(6)) cannot reasonably be interpreted as establishing or condoning the doctrine of "implied malice" advocated by the Ninth Circuit Court of Appeals in *Cecchini.* (See e.g.; *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *McIntyre v. Kavanaugh,* 242 U.S. 138, 142, 37 S.Ct. 38, 40, 61 L.Ed. 205 (1916); *Tinker v. Colwell,* 193 U.S. 473, 488, 24 S.Ct. 505, 509, 48 L.Ed. 754 (1904). This court suggests that these cases stand simply for the established rule that "malice" *towards the specific individual* need not be shown. There is no indication that the Supreme Court or Congress ever intended to abolish the requirement that courts make an express finding as to the maliciousness of the *conduct;* that is, whether the debtor *intended* to cause injury.) Nonetheless, this court is clearly bound by Ninth Circuit Court of Appeals precedent and will act and rule accordingly.

As was set forth in this court's findings of fact, there is no substantial evidence in support of the conclusion that WASHINGTON converted anything or, further, that his conduct was "wrongful". Rather, it was this court's decided impression that TRAVELERS' agents actually condoned and encouraged INSTA CHECK's conduct. Consequently, the *Cecchini* "doctrine of implied malice" is not applicable to the facts of this case. Furthermore, because this court is unconvinced that WASHINGTON, on behalf of INSTA CHECK, harbored any "intent to injure" TRAVELERS by commingling the latter's funds in the former's general account, TRAVELERS' will be denied any relief under 11 U.S.C. § 523(a)(6).

iii. *Third Cause of Action for Imposition of a Constructive Trust and for an Accounting*

 Finally, TRAVELERS seeks an order imposing a constructive trust over all assets into which the proceeds of its money orders collected by INSTA CHECK can be traced. Creation of a "constructive trust" is a remedy "... flexibly fashioned in equity to provided relief where a balancing of interests in the context of a particular case seems to call for it". (*In re North American Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir.1985); Amended at 774 F.2d 1390; Cert. denied, 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986)[14]; See generally; 60 Cal.Jur.3d, Trusts §§ 287–290; 76 Am.Jur.2d Trusts § 248 et seq.). Notwithstanding the fact that TRAVELERS has been unsuccessful in tracing the subject proceeds, this court has already found its conduct in connection with this case to be worthy of equitable relief in favor of the *debtor*. Consequently, this court will not exercise its discretion to impose a constructive trust in favor of TRAVELERS. WASHINGTON will, however, be required to account for all TRAVELERS money order blanks still in INSTA CHECK's possession (if any).

## DISPOSITION

 Pursuant to the findings of fact and conclusions of law set forth in the above memorandum of decision, the debt owed by WASHINGTON to TRAVELERS is hereby declared DISCHARGEABLE.

Nonetheless, pursuant to its order issued May 4, 1989 and having reviewed counsel's cost bill and determined that such costs were reasonable, this court will grant TRAVELERS' request and WASHINGTON will be liable (irrespective of his discharge) for costs of $426.00 incurred in attending the scheduled but postponed trial on that date.

Counsel for WASHINGTON shall forthwith prepare and submit a proposed judgment consistent with the above memorandum of decision.

---

**14.** The court continues by noting that "[w]e [must] necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws. (*In re North American Coin & Currency, Ltd.*, supra, at p. 1575, citing *In re Visiting Home Services, Inc.*, 643 F.2d 1356, 1360 (9th Cir.1981); *Hassen v. Jonas*, 373 F.2d 880, 881 (9th Cir.1967)).