**In re David A. TALLANT, Debtor.**

**Curtis L. KAUFMAN, Plaintiff,**

v.

**David A. TALLANT, Defendant.**

**Bankruptcy No. 93–26492–A–7.**
**Adversary No. 93–2523.**

United States Bankruptcy Court,
E.D. California,
Sacramento Division.

April 15, 1997.

G. Michael Williams, Ganzer & Williams, Stockton, CA, for Plaintiff Curtis L. Kaufman.

Martin B. Brifman, Law Offices of Martin B. Brifman, Sacramento, CA, for Defendant David A. Tallant.

## MEMORANDUM OF DECISION

DAVID E. RUSSELL, Chief Judge.

The plaintiff filed an adversary complaint against the Debtor seeking a judgment de-

claring his unsecured claim nondischargeable under 11 U.S.C. § 523. On July 31, 1996, the court conducted a trial on the complaint. After considering the evidence presented at trial, the arguments of counsel, the post trial briefs, and the entire record of the case, the court finds the debt is excepted from discharge.

## FACTUAL BACKGROUND

The plaintiff, Curtis Kaufman (Kaufman) first met the debtor, David Tallant (Tallant) at a golf course in 1977 or 1978. Over the next several years, Kaufman and Tallant became very close friends. When they met, Kaufman ran a construction company known as Kaufman Construction and Development, Inc. Tallant operated a very successful law practice specializing in business and personal injury litigation. Tallant quickly won Kaufman's confidence. In 1981, he provided Kaufman with an opportunity to bid on an office construction contract for one of Tallant's clients—a bid which Kaufman Construction won. Kaufman then retained Tallant to represent both Kaufman Construction and Kaufman himself. Later, Tallant also represented Kaufman's brother, Jerry Kaufman, and Kaufman's father, Paul Kaufman.

By the late 1980's and early 1990's, Kaufman's personal financial situation deteriorated due to a downturn in the real estate market. By this time, Tallant had performed a substantial amount of legal work for Kaufman and Kaufman turned to Tallant for counseling on how to address his financial situation and deal with creditors. Tallant assisted Kaufman, and defended him against one creditor's suit, but eventually referred Kaufman to a bankruptcy attorney. Although Kaufman's brother elected to file for bankruptcy protection, Kaufman himself avoided filing.

In March of 1991, Kaufman's father passed away and Kaufman was appointed executor. When Tallant learned of this, he approached Kaufman and requested a loan of $25,000 from his father's estate. Kaufman agreed, but left it to Tallant to structure the transaction. Tallant did so. He prepared a promissory note and a deed of trust to secure the note. The note provided for interest at 12% and an initial term of 60 days, but when the note became due, Tallant asked Kaufman for an additional loan of $15,000. Kaufman consented to the proposal and Tallant prepared a modification to the original note to reflect the new terms. On both occasions, Tallant failed to apprise Kaufman of any potential conflict of interest he faced in conducting a business transaction with his client nor did he advise Kaufman to confer with independent counsel. However, Tallant eventually paid the note in full, along with interest at the rate indicated in the note.

Despite receiving some funds from his father's estate, Kaufman's financial troubles persisted. But in May of 1992, Kaufman's financial situation dramatically changed. He learned that he would receive a sizable distribution from a deceased relative's trust estate. Kaufman kept this information closely guarded, but one of the few people he confided in was his attorney, Tallant. Kaufman sought Tallant's advice on how to manage the funds. Tallant, to keep the funds out of the hands of Kaufman's creditors, advised Kaufman to open an off-shore bank account, deposit any cash with a small bank in Sacramento, and deposit any securities received with Jefferies and Company in Los Angeles. Tallant explained to Kaufman that creditors would have a difficult time tracing any assets in these three depositories, thus preserving Kaufman's appearance of impecuniosity while negotiating settlements with creditors.

A few months later, in July of 1992, Tallant, aware of Kaufman's new wealth, called Kaufman to ask for a loan. They met at Tallant's law offices and Tallant explained that he was in a bind on a development project. Tallant stated he needed approximately $500,000 to settle a lawsuit regarding a pension plan investment in the project and asked Kaufman to lend him $250,000 of that amount. Tallant assured Kaufman that the borrowed money would be paid back and proceeded to discuss his sources of payment and security for Kaufman. Tallant explained that he expected a new infusion of funds for the property development project from any one of several sources, money that would replace the funds being withdrawn in the lawsuit settlement. Tallant assured Kauf-

man that the new funding, once in place, would be used to pay off Kaufman's loan. To further protect Kaufman, Tallant promised to name Kaufman as a beneficiary on a $2,000,000 life insurance policy; in the event of his death, Kaufman would receive proceeds from the policy. Tallant also told Kaufman he would receive a blank quit claim deed. Tallant held a parcel of property in Placer County which, although encumbered, purportedly provided Tallant with $500,000 in equity. Tallant advised Kaufman that, in the event of default, he could protect the loan by filling in the blank deed with the lot number of the Placer County parcel.

Finally, during these discussions, Tallant asked his assistant to prepare a year-to-date profit and loss statement for his law practice. Tallant reviewed the statement with Kaufman and assured Kaufman that he expected his practice to gross approximately $800,000 for the year, revenue that Tallant said would provide ample funds to pay off Kaufman's loan even if all other sources of new funding for the development project failed to materialize.

Tallant, however, failed to give Kaufman an accurate portrayal of his financial condition. At the time he requested the loan, Tallant owed close to $3,000,000 in other unsecured debt.[1] Tallant made no mention of this debt load to Kaufman. As for the real property, Tallant's purported equity depended upon successful development of the project. The development, in turn, depended on significant new investment and none of Tallant's sources for new funding were guaranteed. As for the insurance policy and quit claim deed, Tallant did not explain the limited value of those measures as security devices in the event of Tallant's default, even though Kaufman relied upon Tallant, as his attorney, to properly counsel him regarding the loan and to take steps to insure that he was protected. Nor did Tallant explain the potential conflicts of interest inherent in an

attorney-client business transaction or advise Kaufman to seek independent legal representation. And Tallant failed to warn Kaufman of the risks involved in an unsecured loan.

Kaufman agreed to lend Tallant the money but explained he did not possess $250,000 in cash. Since Tallant was aware that Kaufman held in excess of $250,000 of securities with Jefferies and Company, he advised Kaufman to borrow the funds using the securities as collateral and agreed to compensate Kaufman for any interest charges incurred by Kaufman in borrowing against his account. Kaufman had never conducted that type of transaction, so Tallant helped Kaufman make the necessary arrangements with the brokerage house. Shortly after receiving the proceeds, Tallant sent Kaufman a promissory note and a letter memorializing the agreement. The promissory note provided for monthly interest payments at the rate set by Jefferies and Company on Kaufman's borrowing. The note also provided that principal and all outstanding interest was due within a six month term.

Kaufman never received any interest payments on the loan. Tallant also failed to designate Kaufman as the beneficiary on any life insurance policy. After the note became due, Kaufman, on several occasions, asked Tallant about the status of the loan, and Tallant assured him that the new funding for the project development was proceeding smoothly and Kaufman could expect to be paid shortly. Tallant continued to reassure Kaufman up until the time he filed for bankruptcy on July 30, 1993.[2] On the date of filing, Tallant's schedules indicate total liabilities of close to $4,000,000. The schedules place a value of $750,000 on the Placer County property, but show encumbrances of $770,000. As for his law practice, Tallant earned income of approximately $525,000 in 1991, income of approximately $775,000 in 1992,

---

1. The approximately $3,000,000 in unsecured debt does not include potentially significant liability on 16 claims that are listed in Tallant's schedules as amount "unknown."

2. In January of 1993, Kaufman extended yet another loan to Tallant in the amount $25,000 notwithstanding the fact that he had yet to re-

ceive any interest payments on the loan at issue in this case. At trial, the parties explicitly reserved the matter of this additional loan to a later date. Accordingly, although some limited evidence appears in the record with respect to this second loan, the court does not rely on it.

and income of approximately $280,000 through the first seven months of 1993.

## DISCUSSION

### A. SECTION 523(a)(4)

■ Generally, bankruptcy operates as a discharge of all provable debts, giving an "honest but unfortunate debtor" a fresh start. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755, 765 (1991). Section 523 acts as an exception to this rule, with each subsection identifying a class of debt Congress has deemed payable notwithstanding any hardship this might cause the debtor. The code, however, favors discharge, and courts narrowly construe the exceptions. *In re Barrack*, 201 B.R. 985, 989 (Bankr.S.D.Cal.1996) (citations omitted).

■ Kaufman asserts his loan to Tallant is excepted from discharge by section 523(a)(4). That section states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity. . . . ;

11 U.S.C. § 523(a)(4). If the relationship between the debtor and the creditor falls within this provision, then the slightest defalcation will render the resulting debt nondischargeable. *In re Lewis*, 97 F.3d 1182, 1186 (9th Cir.1996). A "defalcation" includes even innocent or negligent defaults, and the mere inability of the fiduciary to fully account for all money received is enough to create liability for the shortfall. *Id.*

■ Because the term "defalcation" reaches so broadly, the scope of the term "fiduciary" is sharply circumscribed. The general definition of "fiduciary" that encompasses a vast array of relationships at state law does not apply in the context of a nondischargeability complaint. *Lewis*, 97 F.3d at 1185 (citing *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir.1986). Instead, only those fiduciary relationships that arise from an express or technical trust are actionable under § 523(a)(4). *Id.* at 1185. *See also In re Niles*, 106 F.3d 1456, 1459 (9th Cir.1997) (as a predicate to a finding of nondischargeability, the plaintiff must prove the existence of an express trust).

■ This definition excludes the *ex maleficio* trust: constructive or implied trusts that arise out of the very act of wrongdoing that is complained of. *In re Short*, 818 F.2d 693, 695 (9th Cir.1987); *In re Washington*, 105 B.R. 947, 950 (Bankr.E.D.Cal.1989). However, the plaintiff is not limited to formal trust agreements; if a state statute imposes trust-like obligations on parties entering into certain kinds of contracts, these obligations may make a contracting party a trustee. *In re Teichman*, 774 F.2d 1395, 1399 (9th Cir. 1985); *In re Pedrazzini*, 644 F.2d 756, 758 (9th Cir.1981). But to fall within § 523(a)(4), the statute must define a trust res, identify the trustee's duties and authority, and impose the trust obligation on the trustee prior to any wrongdoing. *Teichman*, 774 F.2d at 1399; *In re Librandi*, 183 B.R. 379, 383 (M.D.Pa.1995).

■ In the case at bar, nothing about the transaction itself establishes an express or technical trust. Kaufman simply lent Tallant money; both parties understood Tallant was free to use the funds to serve his personal ends, and they memorialized the understanding in an ordinary promissory note. In other words, the parties stood in a typical lender-borrower relationship. This lender-borrower agreement stands in sharp contrast to a trust relationship. There, the trustee receives money or property on behalf of the beneficiary—the trust res—and holds the funds solely and separately for the benefit of the beneficiary. Moreover, the trust relationship bars the trustee from commingling the funds with his own or misappropriating the funds to his own use, and imposes a duty on the trustee to render a complete and accurate accounting to the beneficiary. Here, Kaufman imposed no such duties on Tallant, and Tallant was free to use the funds for his own purposes.

Kaufman points to the attorney-client relationship as the distinguishing feature of the transaction. Rule 3–300 of the California

Rules of Professional Conduct[3] addresses an attorney's obligations when entering into a business transaction with a client. It places several specific, affirmative duties on counsel. For example, the transaction terms must be fair and reasonable; the attorney must fully disclose the terms to the client; the attorney must advise the client of his right to seek the advice of independent counsel; and the client must consent to the terms of the transaction in writing. But nothing in the statute absolutely bars an attorney from borrowing money from a client, and nothing in the statute states that an attorney who borrows money from a client holds those funds in trust on the client's behalf. *Compare* Rule 4–100 (funds received for the benefit of a client must be deposited in an identifiable client trust account).[4] Kaufman asserts that "when an attorney obtains funds from a client without complying with the applicable Rule, the attorney holds the money expressly in trust for the client." Kaufman fails to cite any authority for this proposition and the court finds none, but, even if true, a trust resulting from the breach of the rule itself is a trust *ex maleficio*, and *ex maleficio* trusts fall outside the exception to discharge of § 523(a)(4). *In re Washington*, 105 B.R. at 950.

The majority of courts reach the same conclusion, holding that attorney-client business transactions do not, without more, fall within § 523(a)(4). *See e.g., In re Young*, 91 F.3d 1367 (10th Cir.1996); *In re Mason*, 191 B.R. 50 (Bankr.S.D.N.Y.1996); *In re Stokes*, 142 B.R. 908 (Bankr.N.D.Cal.1992); *In re Gans*, 75 B.R. 474 (Bankr.S.D.N.Y.1987). However, there are enough decisions to the contrary to warrant mention. *See e.g., In re*

*Sheffield*, 180 B.R. 814 (Bankr.W.D.La.1995); *Matter of Charfoos*, 183 B.R. 131 (Bankr. E.D.Mich.1994). These cases hold that an attorney's failure to comply with professional responsibility rules when entering into a business transaction with a client, suffices to take any resulting debts outside the grace of discharge by virtue of § 523(a)(4). This court respectfully disagrees with those decisions. Although the professional responsibility rules impose duties of disclosure on attorneys, and although an attorney stands in a "fiduciary" relationship to the client as that term is generally understood at state law, the Ninth Circuit requires more than that; it requires a trust relationship. *In re Niles*, 106 F.3d at 1463; *In re Lewis*, 97 F.3d at 1185; *In re Short*, 818 F.2d at 695. As discussed above, the disclosure rules applicable to an attorney-client loan do not create a trust. *Compare* Rule 4–100. Nor do those rules transform what is a loan into a trust res. Consequently, Kaufman's cause of action under 523(a)(4) must fail.

## B. SECTION 523(a)(2)(A)

Kaufman also asserts a claim of actual fraud. Although the attorney-client relationship is not enough to pull the transaction within § 523(a)(4), that relationship does bear upon a cause of action based on fraud.[5] *See In re Young* 91 F.3d 1367 (10th Cir.1996) (attorney-client business transaction not within prohibition of § 523(a)(4), but failure to disclose conflict of interest amounts to fraudulent nondisclosure under § 523(a)(2)(A)). Section 523(a)(2)(A) states:

---

**3.** Rule 3–300 of the Rules Of Professional Conduct Of The State Bar Of California states:

A member shall not enter into a business transaction with a client; or knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client, unless each of the following requirements has been satisfied:
(A) The transaction or acquisition and its terms are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which should reasonably have been understood by the client; and
(B) The client is advised in writing that the client may seek the advice of an independent lawyer of the client's choice and is given a

reasonable opportunity to seek that advice; and
(C) The client thereafter consents in writing to the terms of the transaction or the terms of the acquisition.

**4.** Kaufman does not allege, and the court does not find that Rule 4–100 applies to loan transactions between an attorney and a client.

**5.** Kaufman's complaint expressly asserts "actual fraud" but fails to identify § 523(a)(2)(A) as the proper statutory code section for that cause of action. However, both parties directly addressed the issue at the trial and in their post trial briefs, thus the court reaches the merits. *See* Fed. R.Civ.P. 15(b).

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

■ The Supreme Court has explained that, in section 523(a)(2)(A), Congress intended to except from discharge what would at common law amount to fraud. *Field v. Mans,* — U.S. —, —, 116 S.Ct. 437, 443, 133 L.Ed.2d 351 (1995). The Court then turned to "the most widely accepted distillation of the common law of torts ... the Restatement (Second) of Torts (1976)" to identify the elements of the cause of action under § 523(a)(2)(A). *Id.* at — — —, 116 S.Ct. at 443–44. Those elements, which the creditor must prove by a preponderance of the evidence, are:

(1) the debtor made a representation;

(2) the debtor knew at the time the representation was false;

(3) the debtor made the representation with the intention and purpose of deceiving the creditor;

(4) the creditor justifiably relied on the representation and;

(5) the creditor sustained damage as the proximate result of the representation.

*In re Apte,* 96 F.3d 1319, 1322 (9th Cir.1996).

## 1. NONDISCLOSURE AS A MISREPRESENTATION

■ In the case at bar, the alleged misrepresentations do not consist of positive assertions. Instead, Kaufman contends that Tallant withheld material information and that the nondisclosure of this information amounts to fraud. The court agrees.

When evaluating a debtor's liability for fraudulent nondisclosure, the Ninth Circuit has turned to section 551 of the Restatement (Second) of Torts (1976). *In re Apte,* 96 F.3d

at 1324; *In re Eashai,* 87 F.3d 1082, 1089 (9th Cir.1996). Section 551 states:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them;

■ As subsection (1) indicates, a bargaining adversary ordinarily owes no duty to disclose information acquired by his own thrift or better business acumen. Restatement (Second) of Torts § 551 cmt. k (1976). However, subsection (2)(a) suspends this general rule for relationships of trust and confidence and imposes an affirmative duty of disclosure on the fiduciary. The attorney-client relationship falls within this class. *See* Restatement (Second) of Torts § 551 cmt. f (1976).

■ Tallant argues that his failure to disclose his $3,000,000 in unsecured debt is a representation "respecting the debtor's ... financial condition" and, as such, is actionable only under § 523(a)(2)(B), a subsection that requires proof of slightly different elements than § 523(a)(2)(A). Tallant is correct, but overlooks the fact that he owed Kaufman additional duties of disclosure apart from the information regarding his financial condition.

As noted above, California Rule of Professional Conduct 3–300 mandates that, before entering a business transaction with a client, "the client [must be] advised in writing that the client may seek the advice of an independent lawyer of the client's choice." This professional responsibility rule simply states a duty of disclosure already owed at common

law.[6] *Cf. Matter of Charfoos*, 183 B.R. 131, 136 (Bankr.E.D.Mich.1994) (full disclosure and fairness requirement of professional responsibility rule encapsulates duty owing at common law); *Id.* at 135–36 (citing American Bar Foundation, Annotated Code of Professional Responsibility 205 (1979) for same proposition). As his attorney, Kaufman looked to Tallant to shepherd his legal interests, and relied upon Tallant to give him proper legal advice. Before borrowing money from his client, Tallant had a duty to warn Kaufman that their relationship had dramatically changed, that their interests had become adverse, that unsecured lending posed risks to Kaufman, and that Kaufman could and should seek independent counsel to provide him with the objective legal advice that Tallant could no longer render. Tallant's failure to disclose this information, information that Kaufman had a right to know before consummating the transaction, amounted to a false representation.

## 2. INTENT

■ The breach of an attorney's duty to disclose does not result in per se nondischargeability of the resultant debt. The breach must be fused with an intent to deceive. *In re Apte*, 96 F.3d at 1322. The court may infer that intent from the totality of the circumstances. *In re Bonnanzio*, 91 F.3d 296, 301 (2nd Cir.1996); *In re Miller*, 39 F.3d 301, 305 (11th Cir.1994).

■ Tallant emphasizes that he sincerely hoped to comply with the terms of the promissory note. Perhaps, but the assertion misses the point. The mens rea for fraud is the defendant's intent to induce action in reliance upon a misrepresentation. *See* Restatement (Second) of Torts § 531 & cmt. c (1976). Here, the totality of circumstances surrounding the event indicates Tallant intended to exploit his client's trust to obtain the loan on favorable terms.

To begin with, at the time of the transaction, Tallant must have realized he would be unable to obtain an unsecured loan on any reasonable terms from someone represented by competent counsel; at the time of the loan, Tallant owed close to $3,000,000 in liquidated debt and an undetermined amount of contingent and unliquidated debt. Tallant failed to warn Kaufman of his precarious financial state. Although (as discussed below) false statements respecting financial condition fall outside of a § 523(a)(2)(A) claim, the court views this omission as a significant, additional badge of fraud.

Additionally, Tallant must have known Kaufman would be susceptible to his influence. Trust is implicit in the attorney-client relationship and Tallant methodically cultivated Kaufman's faith over the course of many years. Early in their association, Tallant helped Kaufman obtain a very lucrative construction contract. A short time later, Tallant represented Kaufman in a personal injury suit. In their first business transaction (the loan to Tallant from Kaufman as executor of his father's estate), Tallant structured the loan, secured it with a deed of trust, wrote a modification extending the term and increasing the principal amount, and then paid it off in full with interest to the Kaufman estate. This was certain to put Kaufman off his guard in any future transactions. Still later, when Kaufman confronted a personal financial crisis, he turned to Tallant for advice. And when Kaufman received word of his financial windfall, Tallant was one of the first people Kaufman contacted.

In the face of this trust, Tallant presented Kaufman with a montage of supposed security devices (life insurance, a quit claim deed, the prospect of several new funding sources, and the image of a lucrative law practice). Kaufman relied upon Tallant for legal advice yet any competent counsel would have debunked the value of the security Tallant offered. In short, the court holds no doubt that when Tallant turned to his client for

---

**6.** A breach of the statutory duty itself may be actionable; one who makes a misrepresentation during the course of complying with statutory disclosure requirements may be subject to liability at common law:

> If a statute requires information to be furnished ... for the protection of a particular class of persons, one who makes a fraudulent misrepresentation in so doing is subject to liability....

Restatement (Second) of Torts § 536 (1976).

money, he purposefully suppressed the warnings Kaufman needed to protect his own interests. *See also In re Anastas*, 94 F.3d 1280, 1286 (9th Cir.1996) (reckless disregard for truth of representation satisfies the element of intent).

### 3. RELIANCE AND PROXIMATE CAUSE

 Kaufman must also demonstrate justifiable reliance *Field v. Mans*, — U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351; *In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir.1992). This is a subjective standard focusing on the individual capacity of the plaintiff and circumstances of the case as opposed to an objective, "community standard" of conduct. *Id.* Kaufman easily meets this test here. As just discussed, reliance is inherent in the attorney-client relationship. To the extent any more showing is require of the plaintiff, Kaufman has done so.

 Turning to the last element, proximate cause, had Tallant properly warned Kaufman that he faced a conflict of interest in the transaction and, had Kaufman been advised to seek independent counsel, it is almost certain that Kaufman would have avoided the loss. Moreover, it is this very loss the rule of professional responsibility is intended to avoid. Tallant's failure to render accurate advice, despite his duty to do so, proximately caused Kaufman's loss. *See In re Apte*, 96 F.3d at 1323 (the nondisclosure of a material fact in the face of a duty to disclose may be used to establish the requisite reliance and causation for actual fraud).

### C. SECTION 523(a)(2)(B)

Section 523(a)(2)(B) is the statutory companion to section 523(a)(2)(A). The elements of § 523(a)(2)(B) are:

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B). *See also In re Candland*, 90 F.3d 1466, 1469 (9th Cir.1996) (rewording statute into seven elements).

 It is well established that § 523(a)(2)(A) and § 523(a)(2)(B) are mutually exclusive. *In re Ransford*, 202 B.R. 1, 3 (Bankr.D.Mass.1996). The former "applies expressly when the debt follows a transfer of value or extension of credit induced by falsity or fraud (not going to financial condition), the other when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied." *Field v. Mans*, — U.S. ——, ——, 116 S.Ct. 437, 441, 133 L.Ed.2d 351 (1995). This dichotomy creates a curious anomaly: if stated orally, a false statement respecting the debtor's financial condition, no matter how egregious, will not render the debt nondischargeable. *In re Ransford*, 202 B.R. at 3; *Engler v. Van Steinburg*, 744 F.2d 1060, 1060–61 (4th Cir.1984); *In re Mercado*, 144 B.R. 879, 882 (Bankr.C.D.Cal.1992).

### 1. STATEMENT IN WRITING

 Kaufman asserts Tallant produced a year-to-date profit and loss statement for his law practice when inducing Kaufman to extend the loan. Although Tallant showed Kaufman this financial statement, he did not give it to him. Thus the threshold issue in Kaufman's § 523(a)(2)(B) claim is whether Kaufman may use the profit and loss statement to satisfy the writing requirement of the section even though he cannot produce the writing for the court. He may. The statute prohibits "use of a statement in writing" that is materially false. Nothing in the statute or the legislative history indicates this phrase requires the creditor to produce the writing itself at trial. Moreover, Tallant readily admits his assistant generated the document and that he showed it to Kaufman to demonstrate his law practice produced sufficient income to pay the loan. *Cf.* Fed. R.Evid. 1004 (where original is lost or destroyed, proponent may prove contents of a writing by other evidence); *Flick v. Borg–Warner Corp.*, 892 F.2d 285, 288 (3rd Cir.

1989) (contents of document may be established by testimony of draftsman, those who read it, or others with knowledge of its provisions). Given the plain language of the statute and Tallant's admission, the court finds Kaufman has satisfied the writing requirement.

## 2. MATERIALLY FALSE

■ Courts have recognized that a half-truth may be as misleading as a statement that is wholly false. For example, a statement is materially false under this section if it paints a substantially untruthful financial picture and omits information that would have affected the creditor's decision making process. *See In re Furio*, 77 F.3d 622, 625 (2nd Cir.1996); *In re Candland*, 90 F.3d at 1470 (material misrepresentations are substantial inaccuracies of the type which would generally affect a lender's decision). *See also* Restatement (Second) of Torts § 529 cmt. a (1976) ("thus a prospectus that accurately states the assets, bonded indebtedness and net earnings of a manufacturing corporation but omits any reference to its floating debt is a false representation of the financial position of the company").[7]

■ Here, Tallant's profit and loss statement conveyed an impression of great profitability while failing to reveal Tallant's hopeless insolvency. The most significant aspect of Tallant's financial state at the time of the loan was the $3,000,000 in unsecured debt. Although his law practice generated significant income, Tallant could not hope to pay off all of this unsecured debt in any reasonable amount of time, yet he led Kaufman to believe the loan might be easily repaid even if all other sources of funding dried up. Half-truths may amount to fraud. Tallant's presentation of his financial condition was materially false.

## 3. INTENT AND RELIANCE

■ The intent under the § 523(a)(2)(B) claim differs slightly from that discussed in the § 523(a)(2)(A) cause of action. Here, Kaufman must prove Tallant intended to omit mention of the unsecured debt to induce

the loan. But the court again looks to the totality of circumstances and finds that Kaufman sustained his burden of proof. Without question, for the purpose of determining the riskiness of an unsecured loan, the $3,000,000 in outstanding debt represented the most significant data point in Tallant's financial picture. Rather than turn to a financial institution, which almost certainly would have required Tallant to produce a complete financial statement, Tallant turned to his client. It stretches credulity too far to believe Tallant's failure to mention $3,000,000 in debt was a mere oversight; Tallant purposefully omitted the debt to obtain a loan from Kaufman.

■ Section 523(a)(2)(B) requires reasonable reliance as opposed to the justifiable reliance standard of § 523(a)(2)(A). However, the higher reliance standard is primarily to protect consumers against abuse by presenting an obstacle for creditors acting in bad faith. *In re Vann*, 67 F.3d 277, 282 (11th Cir.1995); *In re Bonnanzio*, 91 F.3d 296 (2nd Cir.1996) (citations omitted). In all other cases, it is a low hurdle for the creditor to meet. *Id.* As discussed above, Tallant provided Kaufman with numerous assurances and Kaufman had no reason to suspect his attorney would expose him to unreasonable risk. Kaufman's reliance was reasonable. See *In re Candland* 90 F.3d at 1471 (creditor need not conduct an independent investigation to demonstrate reasonableness).

## CONCLUSION

■ Kaufman extended a loan to Tallant and no statute governing the attorney-client relationship creates an express trust out of business transaction proceeds in that setting. Consequently, § 523(a)(4) creates no bar to the discharge of the debt Tallant owes Kaufman on the loan. However, an attorney may not freely exploit the trust and confidence of a client. When an attorney changes roles and assumes the position of a bargaining adversary, he must warn the client of the conflict of interest inherent in the transaction and inform the client that he may seek the advice of independent counsel. Suppression of those warnings, when done for the purpose of gaining an unfair advantage over a client,

---

**7.** While § 523(a)(2)(B), unlike § 523(a)(2)(A), does not refer to common law torts, the court finds the Restatement is helpful in defining the phrase "materially false."

amounts to fraudulent nondisclosure, and a debt so incurred is nondischargeable by virtue of § 523(a)(2)(A). Kaufman sustained his burden of proof on each of the elements of this claim.

Additionally, Tallant misrepresented his financial condition. Tallant, in an effort to induce Kaufman to advance the loan, assured Kaufman that the earnings of his law practice would suffice to pay back it back. However, Tallant only presented Kaufman with half the truth. He showed Kaufman a statement of earnings but omitted any mention of his mountain of unsecured debt. This half-truth amounted to a fraudulent misrepresentation and Kaufman sustained his burden of proof on each element of the § 523(a)(2)(B) claim.

Accordingly, the court finds that the debt Tallant owes to Kaufman is nondischargeable. Kaufman's declaration, placing damages at the principal sum of $250,000 plus interest at the rate of 10% per annum from July 31, 1992, is uncontradicted.

The foregoing shall constitute the court's findings of fact and conclusions of law. An appropriate judgment shall issue.